# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 1, 2011 Session

## DAVID IVY v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
### No. 01-12388    John T. Fowlkes, Jr., Judge

---

### No. W2010-01844-CCA-R3-PD  - Filed December 21, 2012

---

The Petitioner, David Ivy, appeals from the Shelby County Criminal Court's denial of his petition for post-conviction relief.  A Shelby County jury convicted the Petitioner of premeditated first degree murder and sentenced him to death.  The Tennessee Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal.  See State v. Ivy, 188 S.W.3d 132 (Tenn. 2006).  On appeal, the Petitioner asserts that (1) he is actually innocent of the offense; (2) counsel were ineffective in both phases of the trial and on appeal; (3) the State committed prosecutorial misconduct during closing arguments in both phases of the trial; (4) the application of the prior violent felony aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2) was improper; (5) the Capital Defense Team of the Shelby County Public Defender's Office is "constitutionally ineffective"; and (6) the death penalty is unconstitutional.  We affirm the judgment of the trial court denying the Petitioner post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON P.J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Paul Kellison Guibao, Larry E. Copeland, Jr., and Matthew Stephen Lyons, Memphis, Tennessee, for the appellant, David Ivy.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey Dean Zenter, Assistant Attorney General; Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Petitioner, David Ivy, was convicted of premeditated first degree murder for the June 2001 death of LaKisha Thomas. At the sentencing hearing, the jury found two aggravating circumstances: the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person and the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. T.C.A. § 39-13-204(i)(2), (6) (Supp. 1999). The jury found that evidence of these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death. On appeal, the Tennessee Supreme Court affirmed the Petitioner's conviction and sentence. See State v. Ivy, 188 S.W.3d 132 (Tenn. 2006). The Petitioner sought post-conviction relief, which the trial court denied. This appeal followed.

## TRIAL PROCEEDINGS

The evidence presented during the Petitioner's trial was summarized by the Tennessee Supreme Court as follows:

> In June of 2000, the defendant, David Ivy, was released from prison and placed on parole. Thereafter, he began dating the victim, LaKisha Thomas.
>
> The relationship was marked by Ivy's violence against Thomas. For example, Jackie Bland ("Bland"), the victim's cousin, testified that she once saw Ivy pull Thomas's hair and that on another occasion, Thomas told her that Ivy had kicked in her door and broken her furniture. Deborah Kelley ("Kelley"), another cousin, testified that she also saw Ivy grab Thomas by her hair; when Kelley intervened, Ivy said, "I told you about playing with me, bitch." Andrea Hunt ("Hunt") testified that Thomas told her that Ivy "had her on 23 and 1," because he would only allow her to leave her apartment one hour per day.
>
> In May of 2001, Officer Alvin Clark of the Memphis Police Department responded to a call at Thomas's apartment on Millbranch Road. Thomas told Officer Clark that Ivy had forced his way into her apartment and threatened to kill her. Thomas said that Ivy had been threatening to harm her because she wanted to end the relationship. Officer Clark testified that Thomas was "very shaken up and afraid."

Similarly, on the morning of June 6, 2001, Officer Steve Cummings responded to a call at Jackie Bland's apartment, where he found a bleeding and bruised Thomas. Thomas told Officer Cummings that her "ex-boyfriend," Ivy, had attacked her at a nearby convenience store and had struck her in the head "with a black Uzi type pistol." Thomas told Officer Cummings that Ivy, who was also known as "Day Day," told her "he wasn't going back to jail" and "he would . . . kill her." Officer Cummings testified that Thomas had a two-inch laceration on her head, bruising on her chest, and a black eye on the right side of her face.

Deborah Kelley and Jackie Bland also saw the victim after she was attacked on June 6, 2001. According to Kelley, she arrived at Bland's apartment and found that Thomas was bleeding and bruised. Bland said, "Look what [Ivy] did . . . ." Kelley testified that Thomas told her she had been attacked by Ivy and that Ivy wanted to kill her. Bland called the police. After Officer Cummings responded to the call, Kelley and Bland drove Thomas to the Criminal Justice Center to swear out a warrant against Ivy. While en route, they saw Ivy following them in his car. Kelley pulled over and called police, but Ivy was gone when the police arrived. The women then continued to the Criminal Justice Center where Thomas swore out a warrant for aggravated assault against Ivy.

After leaving the Criminal Justice Center, Thomas, Kelley, and Bland drove to a liquor store. Ivy, who again had been following them, appeared in the parking lot and approached the car. According to Bland, Ivy told Thomas, "Bitch, if you put the police in my business, I'm going to kill you." Similarly, when Kelley returned to the car from the liquor store, Thomas told her that Ivy threatened to kill her "if she put the police in his business."

Ivy's conduct in the liquor store parking lot was captured by a surveillance camera and was witnessed by two employees. One employee, Terrance Hibler, heard Ivy tell Thomas that "it wasn't over" and that "he was going to get her." According to Hibler, Thomas, who was "shaking real bad," said, "I know he's going to kill me." Similarly, another employee, Frank Sullivan, noticed that Thomas was "shaking" and "bruised pretty badly." He too heard Thomas say that Ivy was going to kill her. The police were called; when they arrived at the liquor store, Thomas was taken to the Criminal Justice Center, where she obtained an ex parte order of protection against Ivy.

-3-

Two days later, on the morning of June 8, 2001, Thomas and Hunt were outside Bland's apartment complex in Thomas's car. According to Hunt, Ivy ran up to the car while wearing a black cap and a towel over part of his face. Ivy pulled the towel from his face and said, "Oh, bitch, you want me dead, huh?" He shot Thomas five times and fled. Bland, who was outside her apartment, likewise saw someone wearing a black hat, sunglasses, and a towel over his mouth run up to the car and "open fire." Although the shooter's face was partly covered with a towel, Bland said that he resembled Ivy. Similarly, Deborah Kelley, who was inside Bland's apartment, heard a gunshot followed by screaming. According to Kelley, Bland said, "Call the police. Day Day shot [the victim]." Kelley then heard the noise of tires in the parking lot.

Gregory Kelley, the brother of Deborah Kelley and Jackie Bland, was working as a maintenance supervisor at the apartment complex when he heard gunshots and screaming. He ran to a green car and saw that Thomas had been shot. He pulled Thomas from the car and applied pressure on her wounds while shouting for someone to call 911. He then saw a "white car speed up out of the apartments" that resembled Ivy's car.

Officer Alvin Clark arrived at the scene and saw a white car speeding from the apartment complex. He found that the victim had no pulse. Spent shell casings, bullet fragments, and live rounds were found at the scene.

Dr. O. C. Smith, the medical examiner for Shelby County, Tennessee, conducted an autopsy on the victim. The victim had five gunshot wounds that entered the right side of her body from a distance of no more than two feet away. Although Dr. Smith could not determine the sequence of the gunshots, he concluded that two of the gunshots struck the victim's heart and that the gunshots affected all of the victim's major organs except her spleen. Dr. Smith concluded that the multiple gunshots caused the victim's death and that the two gunshots to the victim's heart would have "ended her life the quickest."

Ivy was arrested on June 27, 2001, and he was incarcerated in the Shelby County Jail pending trial. He escaped from jail in May of 2002. Two months later, Ivy was captured in San Diego, California, after diving through a window and fleeing from police officers for several blocks.

After the prosecution rested its case in chief, Vickie Crawford testified on the defendant's behalf. She stated that she had lived with Ivy and that Ivy

was the father of her daughter. She learned that Ivy was dating Thomas in October of 2000, but she had heard of no problems in their relationship.

The jury convicted Ivy of premeditated first degree murder. The trial then moved into the sentencing phase to determine the punishment.

. . . .

The prosecution presented the testimony of the victim's sister, Elaine Thomas. Ms. Thomas testified that the victim was survived by four children under the age of ten. The children were separated from each other after the victim was murdered and their school work suffered. According to Ms. Thomas, the victim had been the "backbone" of the family, and her death affected the entire family.

The prosecution also presented evidence of Ivy's indictments and convictions for five prior felony offenses. In 1993, Ivy was indicted for premeditated first degree murder and felony murder, and he pleaded guilty to second degree murder. Ivy was also indicted for especially aggravated robbery and three counts of aggravated assault, and he pled guilty to these offenses as well.

In mitigation, Ruby Ivy, the defendant's oldest sister, testified that her brother was born in 1972 and was one of nine children. Ms. Ivy testified that she had been responsible for raising her brother because their mother had health problems. She stated that Ivy was "a good guy" who could "get along with anybody." She said that Ivy loved children and was a talented singer. She acknowledged that she knew about her brother's prior convictions. She asked the jury not to sentence her brother to death.

Vickie Crawford testified that she, Ivy, and the victim had been friends. She said that she maintained contact with Ivy even when Ivy was imprisoned for second degree murder. She intended to continue her relationship with Ivy since he was her daughter's father. She asked the jury to spare Ivy so that their daughter would get to know him.

Other witnesses testified in mitigation. William Fletcher, a former neighbor of the Ivy family, stated that Ivy was a "pretty nice kid" who always treated him with respect. Gladys Hobson, another former neighbor, testified that decisions of "life and death" should not be made by man. Similarly, Kim Mackey, an acquaintance of the victim and David Ivy, testified that "life and

-5-

death are [not] in our hands."

Ivy, 188 S.W.3d at 139-41.

## POST-CONVICTION PROCEEDINGS

Trial counsel testified that he had been employed on a part-time basis with the Shelby County Public Defender's Office since May 1996. At the time he represented the Petitioner, he was assigned to approximately ten first degree murder cases, not all of which were capital cases. No limitation was placed upon the number of first degree murder cases to which an attorney would be assigned. Counsel was unaware of a limitation on the number of cases to which he would be assigned or on the amount of hours which he would work as a part-time assistant public defender.

Counsel testified that he was assigned the Petitioner's case while it was in the general sessions court. He had been lead counsel in six to twelve capital cases before being assigned to the Petitioner's case. He acknowledged that as lead counsel, he was responsible for deterimining the direction of the case. Counsel said the defense team, which also included co-counsel, an investigator, and a mitigation specialist, met on multiple occasions. Neither a memorandum nor a "case update" was necessarily produced after each meeting.

Counsel testified that he generally met with the client within five days of being assigned to a case and tried to meet with the client every two weeks thereafter. During the initial meeting or intake, counsel obtained the factual background of the case and the client's social background. Counsel did not recall the number of meetings he had with the Petitioner but said he met with the Petitioner an "adequate number of times." Counsel said he also spoke to the prosecutors regarding the case. He believed they discussed a possible resolution of the case but did not recall any details of the discussion.

Counsel testified that the Petitioner provided him with an alibi witness, whose last name was "Brads." He did not personally interview Reginald Kavet Mason or Sergeant Shannon Beasley, who spoke to Reginald Kavet Mason in Covington, Tennessee, regarding an alibi.

Counsel testified that he argued in his opening statement that the witnesses were not in a position to identify the Petitioner as the shooter. He said his position was that none of the witnesses could see the shooter's face. He stated that although witnesses testified at the preliminary hearing that the Petitioner shot the victim, the defense was that the identifications were erroneous.

-6-

Counsel testified that the issue of whether the victim's statements regarding various bad acts committed by the Petitioner were admissible based upon forfeiture by wrongdoing was addressed on the morning jury selection began. While he had notice of the victim's statements to others, counsel had no prior notice that the State intended to present the evidence at the trial. He acknowledged he could have filed a motion in limine to address the admissibility of the bad acts before the trial.

Counsel testified that he did not interview Andrea Hunt, Jacqueline Bland, or Deborah Kelley, all of whom testified regarding acts committed by the Petitioner against the victim. He believed Ralph Nally, the investigator, attempted to interview the women. Counsel did not believe the witnesses would cooperate due to their connection with the victim. He questioned Ms. Hunt at the preliminary hearing.

Counsel testified that he asked Mr. Nally to interview the manager of the Mapco where the victim accused the Petitioner of abducting and assaulting her on June 6, 2001. Counsel said he instructed Mr. Nally to ask the manager if security cameras were installed and if the manager observed anything unusual. Counsel also asked Mr. Nally to interview the manager of Rally's, a fast food restaurant located across the street from the Mapco. Counsel said they were not able to obtain a security video from Mapco or a written statement from an employee who was working when the incident occurred. The Petitioner denied assaulting the victim. Counsel explained that he did not seek a continuance of the trial to continue the investigation because he did not believe further investigation would have resulted in the discovery of additional evidence. He did not obtain the medical records from Delta Medical Center where the victim was treated for a head injury on June 6, 2001.

Counsel testified that he went to Magnolia Place Apartments where the victim accused the Petitioner of breaking into her apartment. He recalled that the Petitioner allegedly broke into the apartment through the back door but that he did not recall the location of the back door. He did not recall asking the responding officer about the location of the back door. When questioned about a photograph showing that two doors were located on the front of the apartment, counsel said it was not "unusual as far as apartment make ups are concerned, to have two doors on the same side of the apartments, to refer to one as the front and the back."

Counsel testified that he did not interview the witnesses at Joe's Liquors where the victim alleged that the Petitioner threatened her after she initiated criminal proceedings against him. He said the witnesses only testified at the trial that the victim was upset after a brief confrontation with the Petitioner.

Counsel testified that he attempted to interview Callie Haley, a witness to the shooting, but that she did not respond. He received Ms. Haley's statement to police in discovery. Ms. Haley said the shooter had a white towel over his face. Counsel said he and Mr. Nally went to the crime scene and compared Ms. Haley's statement regarding her observations to the location of the shooting. Counsel said he believed that Ms. Haley was too far from the shooting to have been an effective witness. He recalled a discrepancy between Ms. Haley's description and other witnesses' descriptions of the shooter's clothing. He stated that after the trial, the Petitioner filed a complaint against him with the Board of Professional Responsibility due to his failure to call Ms. Haley as a witness. Counsel responded that he did not want to call her as a witness because she would have corroborated the description of the towel. He said, "I can't today see any purpose for her testimony, to put on additional corroborative testimony of at least a portion of the State's descriptor."

Counsel did not recall the prosecutor's comment during closing argument that the Petitioner ejected a bullet that was meant for Ms. Hunt. He also did not recall comments from the prosecutor during closing argument bolstering the credibility of Terrance Hibler.

Counsel testified that he generally looked for indications of mental illness or mental disability in his clients and that he had previously represented clients with mental health issues. He said he did not find any evidence indicating that a mental evaluation of the Petitioner was necessary. Counsel noted that while the Petitioner was in prison serving sentences for prior convictions, he obtained his GED and a number of certificates showing his completion of numerous programs, including a program for legal research. He also noted the Petitioner's I.Q. was in the 80s. Counsel said that based upon the information he had, he could not establish a particularized need for funds for a mental evaluation. Although Counsel did not recall the specific records that he reviewed, he said he would have reviewed the Petitioner's school records, medical records, and prison records and would have interviewed family members regarding possible mental issues. Counsel stated that if the Petitioner had been diagnosed with borderline personality disorder, evidence of the diagnosis could have been presented as a mitigating circumstance during the penalty phase. He did not recall finding any information in the Petitioner's records that could have been presented in mitigation.

Counsel identified various certificates of programs that the Petitioner completed while serving his sentences for prior convictions. He said the certificates showed that while the Petitioner was incarcerated, he complied with the rules and regulations and was a productive member of prison society. He said, however, that he did not like to present certificates in lieu of live testimony. He stated that during the penalty phase, the Petitioner became uncooperative and refused to testify.

Counsel testified that Elizabeth Benson, the mitigation specialist, would have provided him with a copy of the Petitioner's school records and that he would have reviewed them before the trial. He said that although he did not specifically recall reviewing the Petitioner's juvenile records, he would have done so. He also said Ms. Benson obtained the Petitioner's medical records from Regional Medical Center and his records from Spencer Youth Center.

Counsel testified that once he received notice from the State of its intent to seek enhanced punishment, he examined the nature and validity of the Petitioner's prior convictions. He did not listen to the tapes of the guilty pleas and did not recall reviewing the transcripts of the pleas. He said he determined that the convictions were valid based upon the documentary evidence in the court's file.

On cross-examination, counsel testified that he believed he had a good working relationship with the Petitioner in the beginning. He said the Petitioner cooperated with the defense team, discussed the facts with them, and identified witnesses for them to interview. The Petitioner escaped from jail while the case was pending. Counsel stated that the defense continued to work on the case because the trial had been scheduled. The trial judge told counsel that the trial would not be continued if the Petitioner was captured.

Counsel testified that the Petitioner denied shooting the victim and that his defense at the trial was based upon "reasonable doubt and making the State prove their case." The theory of defense was that the witnesses' identifications of the Petitioner were "misidentifications" due to their limited view of the shooter and their limited association with the Petitioner. Counsel said he emphasized the inconsistencies in the witnesses' testimony to support the claim of misidentification. He said he did not believe the Petitioner would prevail in the guilt phase of the trial.

Counsel testified that the Petitioner claimed he was in Springfield, Illinois at the time of the shooting. Counsel recalled allegations that the Petitioner was also in Indiana during that time period. He said that the State requested a notice of an alibi but that the Petitioner was unable to provide sufficient information to contact the alibi witness. At first, the Petitioner only provided a first name of the witness. He later provided a complete name and city but did not provide a specific address. Counsel said that the defense was not able to locate the witness and that the trial court found the notice to be insufficient.

Counsel testified that he did not call Ms. Haley as a witness at the trial because she would have corroborated portions of the other witnesses' identification of the shooter. He said he was responsible for determining whether the benefits of certain evidence outweighed its prejudicial effect. He said that although Ms. Haley's statement contradicted portions of

other witnesses' testimony, he decided not to call Ms. Haley because he believed her testimony would have been more harmful than helpful.

The Petitioner did not testify during the penalty phase. Counsel said that during the course of the trial, the Petitioner "seemed to turn off mentally." He said the Petitioner did not consult counsel and refused to listen to their advice regarding whether he should testify. Counsel stated that if he had wanted the Petitioner to testify at the trial, it would have been during the penalty phase.

Counsel testified that during the penalty phase, the Petitioner's sister made a positive comment regarding his character. He said she was instructed not to offer such testimony to prevent opening the door about the Petitioner's prior bad conduct. By making the comment, the Petitioner's sister opened the door to allowing the State to introduce negative information about the Petitioner. Counsel recalled the mitigating evidence was limited due to the Petitioner's childhood, which was not "particularly bad," and his refusal to cooperate.

In explaining his decision against presenting the certificates the Petitioner obtained, counsel testified that he would rather present the testimony of a witness such as the Petitioner or a prison guard. The Petitioner, however, decided not to testify. Counsel said that based upon the circumstances of the offense, the presentation of certificates showing the Petitioner completed anger management classes would not have been beneficial. He stated his decision not to present the certificates was based upon the proof presented, the jury's verdict during the guilt phase, and the makeup of the jury.

Counsel testified that he challenged the use of the prior convictions for aggravated assault, upon which the State relied to support the prior violent felony aggravating circumstance. He also challenged the introduction of the indictment for first degree murder in a previous case in which the Petitioner was convicted of second degree murder. He recalled that the Tennessee Supreme Court agreed the introduction of the indictment was error but that the error was harmless. He also recalled the court agreed that the trial court's refusal to allow him to argue residual doubt was error but that the error was harmless.

Counsel testified that the Petitioner filed five or six complaints against him with the Board of Professional Responsibility after the trial. He said that although such complaints were not unusual in capital cases, the number of complaints the Petitioner filed against him was unusual. Counsel was not disciplined as a result of the complaints.

On redirect examination, counsel read from various notes from the Petitioner's jail records while he was awaiting trial. The notes addressed the Petitioner's requests to see a mental health doctor in January, February, and March of 2002. On one occasion, the

Petitioner complained that he was hearing voices and felt that "the walls were caving in on him." Counsel did not recall the Petitioner's mentioning these issues.

Co-counsel testified that she was assigned to the capital defense team in the Shelby County Public Defender's Office in the fall of 1998 and became head of the team in 2000 or 2001. At the time of the Petitioner's case, the team consisted of co-counsel as the full-time attorney, two part-time attorneys, one investigator, and two mitigation specialists. As the head of the team, co-counsel was responsible for assigning cases. The team members were hired by the Chief Public Defender, and co-counsel did not have any control over the team's budget.

Co-counsel testified that at one point, she had a maximum case load of twenty cases as lead counsel. Those cases included cases in general sessions court, first degree murder cases in which no death notice had been filed, and capital cases. Co-counsel was assigned five or six capital cases at one time. Any first degree murder case would automatically be assigned to the capital case team. The capital case team conducted an intake interview, and the mitigation specialist and investigator would began gathering information. An attorney from the capital case team would represent the defendant at the preliminary hearing. Co-counsel said that near the time of indictment, the team generally knew whether the State would seek the death penalty. If the State chose not to seek the death penalty, the case would be reassigned to an attorney who was not on the capital case team. Co-counsel testified that at the time of this post-conviction hearing, the capital case team consisted of three full-time attorneys and one part-time attorney.

Co-counsel testified that counsel decided which attorney examined which witnesses. She said counsel generally preferred a female attorney to cross-examine the female witnesses to prevent the appearance that he was "ganging up" on the witness. She recalled examining two or three witnesses at the trial, including Ms. Hunt. Co-counsel said she questioned Ms. Hunt regarding her description of the shooter, the features of the shooter covered by the towel, and her identification of the Petitioner as the shooter by his eyes.

Co-counsel testified she would have conferred with counsel before instructing Mr. Nally or Ms. Benson regarding their investigation. She believed Mr. Nally investigated Ms. Haley. She said that if Mr. Nally or Ms. Benson could not locate a witness, they continued to look for the person until it was apparent they could not locate that witness.

Co-counsel testified that she was aware certain bad acts would be at issue at the trial. She said any instructions to investigate those bad acts would have come from counsel. She believed a hearing on the admissibility of the bad acts was held after jury selection but before testimony was presented. She stated that based upon trial counsel's experience trying cases

-11-

before the trial judge, they knew that the evidence would be admitted.

Co-Counsel testified that she may not have met with the Petitioner until closer to the trial and did not recall what, if any, discussions she had with him regarding mitigation. She said she spoke to two or three members of his family and prepared them for their testimony during the penalty phase. She stated that the Petitioner's sister disregarded their instructions and opened the door to allowing the State to cross-examine her about the Petitioner's other bad acts.

On cross-examination, co-counsel testified that she instructed the Petitioner's sister not to testify that the Petitioner was a good person because he had been convicted of murder at that point. She generally told her client's family members to concentrate on the bad things that happened in the client's life or the good things that the client did in school or with his family. Co-counsel stated the Petitioner's sister's testimony that the Petitioner was not a bad person opened the door to allow the State to cross-examine her regarding the things the Petitioner did while he was in prison for previous convictions. Co-counsel said the State was allowed to question her about "[t]hings that would never have been relevant before and it was just continuous. It was just . . . mounds and mounds of things that I believe [the prosecutor] brought in while she was on the stand. It was a meltdown unfortunately."

Appellate counsel testified that he had been employed as an appellate attorney for the Shelby County Public Defender's Office since 1996. Another member of the appellate team was primary appellate counsel before this court. After the primary appellate counsel left the public defender's office, counsel represented the Petitioner before the Tennessee Supreme Court. Appellate counsel said that after the supreme court released its opinion affirming the conviction and sentence, he failed to withdraw from the case and was censured by the Board of Professional Responsibility. He acknowledged that the Board also cited his failure to communicate with the Petitioner.

Appellate counsel testified that in determining which issues to raise on appeal, he was limited to issues raised in the motion for a new trial, issues of plain error, and sentencing issues. He said that if trial counsel did not object to the State's closing argument as improper or raise it in the motion for a new trial, he likely would not raise the issue on appeal unless it rose to the level of plain error. He also said that due to the nature of capital cases, he would "take a harder look" at issues of plain error than he would in noncapital cases.

Appellate counsel testified that two issues of first impression were raised on appeal, the impaneling of an anonymous jury and the admission of evidence based upon forfeiture of wrongdoing. He recalled the supreme court concluded that the reliance upon two prior aggravated assault convictions to establish the prior violent felony aggravated circumstance

-12-

was error but that the error was harmless. He also recalled the supreme court noted the "overwhelming evidence" against the Petitioner and the three other violent felony convictions.

On cross-examination, appellate counsel testified that he did not raise every conceivable issue on appeal. He attempted to raise the most viable issues which he believed had the greatest chance of success, rather than taking "a shotgun approach." He said that by doing so, he believed "the Appellate Courts give you more attention, or at least, more serious attention to that and that actually improves your client's chances of having some success on appeal." Counsel testified the appellate team chose ten issues to raise on appeal after reading the record. He did not see any issues in the record that he felt should have been raised and were not. He did not recall the Petitioner's requesting that certain issues be raised.

Ralph Nally, the fact investigator in the Petitioner's case, testified that he had been an investigator for thirty years. He estimated that he was assigned fifteen to twenty cases while he was assigned to the Petitioner's case. Mr. Nally said that when the trial team was assigned a case, they conducted an intake interview of the client. He reviewed discovery materials provided by counsel and performed tasks based upon assignments from trial counsel or co-counsel.

Mr. Nally testified that he had attended seminars addressing mental health issues. He had also taught criminal justice at a local college and abnormal behavior to police officers for twenty years. He believed he was able to recognize signs of mental health issues but did not claim to specialize in mental health.

Mr. Nally testified that in investigating a case, he deferred to counsel and followed his or her guidance. He said he waited for instructions from counsel. The defense team met periodically when scheduled by trial counsel. The capital defense team also had monthly meetings during which they discussed all their cases. These monthly meetings lasted one and one-half to two hours.

Mr. Nally testified that he and counsel investigated whether security cameras recorded an incident at Mapco. He said he and counsel went to Mapco and Rally's, located across the street, in an attempt to retrieve the recordings of the incident. Neither business had the recordings available. Mr. Nally spoke to an employee at Mapco, but the employee did not work there when the incident occurred. He also attempted to locate any incident reports that may have been filed with the corporation. He was referred to the company's legal department in Memphis. Mr. Nally said he was not able to locate any such information. He did not know whether he was able to identify the employee who worked at Mapco when the incident occurred. He said he was focused on locating the recording rather than the particular

employee.

Mr. Nally testified that he believed he obtained the records of the victim's domestic violence complaints against the Petitioner. He also spoke to Terry Lister regarding any complaints filed by the victim. He believed the State provided the 9-1-1 records in the discovery materials but did not recall attempting to interview Paul Moore, the supervisor of communications. He said he did not attempt to interview Officer Alvin Clark or any other officer involved in the case. He said he generally was unsuccessful in attempting to interview police officers.

Mr. Nally testified that he did not recall interviewing Deborah or Gregory Kelley. He said that he attempted to interview Ms. Hunt but that she refused to cooperate. He was aware that the Petitioner had threatened Ms. Hunt because she had testified at the preliminary hearing. He also attempted to interview Callie Haley, but she did not respond to his requests. Mr. Nally said he interviewed a possible alibi witness but was concerned about whether the statement was true. He visited the scene of the shooting.

Mr. Nally testified that he called a witness regarding the incident at Joe's Liquor Store. He obtained a video recording that showed the victim's talking to someone outside the liquor store. He did not attempt to view the recording using the store's equipment. He explained he was not allowed to use a store's equipment to view recordings.

Mr. Nally testified that he investigated an alleged burglary at Magnolia Place Apartments where the Petitioner and the victim previously lived. He attempted to interview Tasha Cupp but was unsuccessful. He interviewed a resident of the apartment, who told him that the door had been repaired. Mr. Nally did not attempt to obtain any records of the repair.

On cross-examination, Mr. Nally testified that he, trial counsel, and Ms. Benson attended the Petitioner's initial intake interview. Each member of the defense team interviewed the Petitioner regarding information relevant to that team member's job. He said the Petitioner provided him with alibi witnesses. Mr. Nally contacted them, but they were unable to provide an alibi. He also interviewed the Petitioner's family members. He stated that while counsel instructed him regarding which witnesses to interview, he also followed leads on his own.

Mr. Nally testified that he spoke to a former resident of the apartment where the victim lived. She indicated the damage on the door had been repaired. Mr. Nally said she corroborated the testimony presented by other witnesses that the door had been kicked open.

-14-

Mr. Nally testified that not all the fifteen to twenty cases he was assigned at the time of the Petitioner's case went to trial. He said the number of cases that went to trial was relatively small. He also said his case load was not so extensive that he could not devote time to investigate the Petitioner's case.

Mr. Nally testified that he did not find a request to interview Callie Haley in his file. He said he and trial counsel went to Hanley Street, Mapco, and Rally's to investigate the victim's assault allegations. Mr. Nally did not recall a request to go to the neighborhood surrounding Mapco.

Mr. Nally testified that he and trial counsel went to Magnolia Place Apartments to look for evidence of a break in inside the victim's apartment. He stated that no one was at the apartment and that he might have talked to someone about letting them inside the apartment. He did not recall speaking to Ms. Cupp or obtaining any records from the apartment complex.

Elizabeth Benson, the mitigation specialist on the Petitioner's case, testified that she was assigned to fifty murder cases at the time she was assigned to the Petitioner's case. She had been employed as a mitigation specialist in the Shelby County Public Defender's Office since April 1992. She previously worked as a probation officer for pretrial services and as a counselor for Mid-Town Mental Health Center and Whitehaven Mental Health Center. She had not received any training on mental health while at the public defender's office or in her previous employment.

Ms. Benson testified that she was assigned to the case on July 18, 2001, and that the team conducted the Petitioner's intake interview on July 26, 2001. The interview was the only meeting Ms. Benson recalled having with the Petitioner. She said her job as a mitigation specialist was to gather information, interview family members, teachers, and other witnesses regarding mitigation evidence, obtain records, and assist in retaining expert witnesses, if necessary. Ms. Benson did not retain expert witnesses in the Petitioner's case. When questioned regarding why no experts were retained, she responded, "My responsibility was to gather information and then provide that information to the attorneys."

Ms. Benson testified that she received certificates showing that the Petitioner completed several programs while serving a prison sentence before the victim's death. The programs that the Petitioner completed included an eight-week anger management treatment program; a program on substance abuse awareness, anger management, behavior modification, and cognitive skills; a violence intervention program; his GED; two programs related to Alcoholics Anonymous and Narcotics Anonymous; and a cognitive skill development program. Ms. Benson was not able to identify the importance of these

certificates.

Ms. Benson testified that she obtained the Petitioner's school records and records from his employer, Vincent Metal Goods. She said she did not request mental health records or special education records from the Memphis City Schools. She also obtained records from the Regional Medical Center showing that the Petitioner was treated for asthma on December 27, 2001.

Ms. Benson testified that she met with the Petitioner's mother and other members of the Petitioner's family on February 12, 2002. The Petitioner's mother advised Ms. Benson that the Petitioner was a normal child and the youngest of six children. The Petitioner's father was an alcoholic and abusive to his mother. The Petitioner's mother said his father was never abusive to the children and was a good father. She said she had been separated from his father for twenty years. The Petitioner's mother told her that he dropped out of school in the seventh grade and that she began having problems with his behavior when he was seventeen years old. The Petitioner's mother told Ms. Benson that the family did not have a history of mental illness and that to her knowledge, the Petitioner had never been treated for a serious medical problem. Ms. Benson said she learned about the Petitioner's asthma issues from him.

Ms. Benson testified that James Ivy, the Petitioner's brother, described the Petitioner as a very quiet person who was involved in a bad situation. Vicky Crawford, the Petitioner's former girlfriend, told Ms. Benson that she was not dating the Petitioner when the shooting occurred but that he was the father of her daughter. Ms. Crawford told Ms. Benson that she, the Petitioner, and the victim grew up together. She said that before the shooting, she and the Petitioner filed domestic charges against each other but they dismissed their charges. She told Ms. Benson she had a good relationship with the Petitioner.

Ms. Benson testified that the Petitioner's family was reluctant to speak to her about him because they believed "it would do [the Petitioner] more harm than good." She said the Petitioner's brother and sister asked to speak to trial counsel before speaking to her any further. Ms. Benson acknowledged that it was sometimes difficult to persuade family members to talk to her freely and that the best way to have someone open up to her was to communicate with them regularly. She said she spoke to the Petitioner's mother by telephone in February, May, and August 2002 and met with family members in February and December 2002.

Ms. Benson testified that she attempted to contact Joyce Ivy but that Ms. Ivy did not return her call. She said that she called Ruby Ivy's employer and left a message for Ms. Ivy to call her but that she did not do so. Ms. Benson did not interview the Petitioner's former

-16-

teachers, anyone at Wilder or Spencer Youth Center, or anyone with the Tennessee Department of Correction (TDOC). She said that although she received the Petitioner's inmate records from the TDOC, her records did not show she received any of the Petitioner's prison medical records.

On cross-examination, Ms. Benson testified that she relied upon the Petitioner to identify family members who could provide information about him. The Petitioner identified John Willie Ivy, Dorothy Ivy, Joyce Ivy, Ruby Ivy, James Ivy, Paul Ivy, Willie Ivy, and John Briars. The Petitioner told Ms. Benson that to his knowledge, neither he nor any members of his family suffered from mental illness. He did not identify any incidents of physical or sexual abuse. Ms. Benson said the Petitioner told her that he left school in the ninth grade because he associated with the wrong people. He said he could read and write and had no learning disabilities. The Petitioner obtained his GED in 1995 and completed a legal course. Ms. Benson said the Petitioner told her of his previous jobs, most of which lasted for a short period of time.

Ms. Benson testified that she did not receive any information showing that the Petitioner had been diagnosed with a mental disease or defect. She said the Petitioner did not provide her with any details of the shooting or his mental state at the time of the shooting because he denied being there.

Ms. Benson testified that the lack of cooperation with a client's family members was not unusual. She said she informed trial counsel of the family's reluctance to speak to her. She said she was at the trial to aid in the coordination of witnesses and to ensure the availability of the mitigation witnesses. On redirect examination, Ms. Benson said she worked in the geriatrics department at Mid-Town Mental Health Center providing daycare services to geriatrics.

Robert Wilson Jones, the District Public Defender, testified that the head of the capital defense team reported directly to him. He said that at the time of the Petitioner's trial, the capital defense team was assigned eighteen cases, not all of which were capital cases. He said trial counsel was assigned two capital cases, and co-counsel was assigned three capital cases. Mr. Jones said there was no limit to the number of cases that a member of the capital defense team could be assigned.

Mr. Jones testified that the office did not have a budget designated for the capital defense team. Rather, the office had a budget derived from state and county funds. The office did not receive additional funding for establishing a capital defense team but received funding from the Tennessee Supreme Court for training capital defense attorneys. The funding for training mitigation specialists was derived from the budget of the public

-17-

defender's office.

Mr. Jones testified that he created the job duties for an investigator and a mitigation specialist. He examined a candidate's qualifications and prior experience. The employee was then provided training. Mr. Jones stated that the only written criteria were the hiring requirements posted by the county, which were "much broader than just the capital defense."

Mr. Jones testified that no mitigation specialists were on the office's payroll at the time of the post-conviction hearing. He said an investigator was assigned as a mitigation specialist on a case based upon the investigator's experience. At the time of the Petitioner's case, the office had two mitigation specialists and two investigators. On cross-examination, Mr. Jones stated that if an attorney assigned to the case needed additional funding to retain experts, the attorney could request the approval of funds from the trial court.

Ronald Lax, an investigator with Inquisitor, Incorporated, testified as an expert in fact and mitigation investigation in capital cases. He testified that when the company was retained on a capital case, he reviewed the discovery package. He prepared a witness synopsis and a list of prospective tasks based upon the discovery information. He also prepared a list of documents or items that he believed should have been included in discovery and forwarded the memoranda to the attorney. Mr. Lax said he preferred to visit the client after he reviewed the discovery.

Mr. Lax testified that he used his knowledge and expertise in investigating a case rather than waiting for instructions from counsel. He said he visited the crime scene and then visited the client. He had many conversations with trial counsel throughout the case. He documented every aspect of his investigation in a memorandum to counsel. Mr. Lax stated that if counsel asked him to take his investigation in a different direction, he would have done so. He believed part of his job was to make suggestions to trial counsel regarding the investigation and possible experts.

Mr. Lax testified that the first task of a mitigation specialist was an in-depth meeting with the client to obtain signed releases and review everything about the client's life from the first day that the client could remember, including schools, residences, neighbors, girlfriends, jobs, and activities. The mitigation specialist requested records from the various places discussed by the client. Mr. Lax said clients generally did not provide all the necessary information during the first or second interview. The mitigation specialist interviewed the client's family members and continued to obtain records based upon what the specialist learned during the interviews.

Mr. Lax testified that mitigation specialists could analyze documents more effectively than attorneys due to their background and training. The mitigation specialists reviewed records for both their content and any references to other records or treatment obtained by the client.

Mr. Lax testified that one visit with a close family member of a client was generally insufficient to obtain the needed information. He said the specialist's job was to delve into aspects of a client's life that both the client and the family wanted to keep hidden. Moreover, family members generally thought they should only provide favorable information about the client. Mr. Lax said the specialist should develop a rapport with the family.

Mr. Lax testified that most of his clients did not want to discuss mitigation. They wanted to discuss their defense to the charge and did not want to expose their families to the case. Mr. Lax said that as a result, the specialist would not obtain all the required information during the first interview with the client. He also stated that if the client refused to cooperate, the specialist continued to attempt to discover mitigation evidence.

Mr. Lax testified that team members could not do their jobs properly if they had to wait for instructions from counsel before doing any task. He said attorneys expected him to do his job without the need for their guidance at each and every step. He expected counsel to read the materials that he provided and to offer comments on them.

Mr. Lax testified that before he interviewed an eyewitness, he visited the crime scene to determine what the witness could and could not have observed. He attempted to discover any statements previously made by the witness. Mr. Lax said he would also investigate any prior bad act or conviction. He obtained and viewed video surveillance from stores in different cases. He explained that the best way to view video surveillance with multiple tracks was through the machine that recorded the video.

Mr. Lax testified that he generally expended 300 to 500 hours investigating the guilt phase of a capital case. He said the mitigation specialist generally expended 400 to 600 hours on his or her investigation. He employed these standards between 2001 and 2003. On cross-examination, Mr. Lax acknowledged that he did not speak to trial counsel, co-counsel, Mr. Nally, or Ms. Benson about the Petitioner's case.

Clark Chapman, a private investigator, testified that post-conviction counsel requested him to obtain records from Magnolia Place Apartments. He went to the apartment complex, but no staff were there. He contacted Lawrence Johnson Realty, the company that managed the property. Mr. Chapman said he was told that the company did not manage the property in 2001 and was directed to Robert Shrake, who owned the property during that time period.

He located Mr. Shrake in California. Mr. Chapman stated that Mr. Shrake had multiple boxes of records regarding the complex but that he was unable to locate any records regarding repairs to the apartments. Mr. Chapman also confirmed that Tasha Cupp lived at the apartment complex and spoke to her briefly.

Mr. Chapman testified that he took photographs of the apartment complex. He noted that two doors were located at the front of each apartment. He said there was no door at the back of the apartment. Mr. Chapman also went to Mapco where he located a witness and took photographs.

John David Morledge, a mitigation investigator with Inquisitor, Inc., testified that he conducted a mitigation investigation of the Petitioner's case, which included a review of Ms. Benson's investigation. He said the goal of a mitigation investigation was to learn as much as possible about the client and his family. He explained, "[W]e want to cast out nets as wide as we can in a mitigation investigation because you just really never know what you're going to get until you do that."

Mr. Morledge testified that when he received a record, he reviewed it and prepared a memorandum for counsel in which he emphasized the important portions of the record. He did not wait on counsel's instructions to investigate a case. He stated that his goal during the first client interview was to develop a rapport with the client and to determine the places from where he should request records.

Mr. Morledge testified that he reviewed the Petitioner's school records obtained from Memphis City Schools. Mr. Morledge noted the Petitioner failed the fourth grade, which could have been the result of learning problems or excessive absences. He also noted the Petitioner failed the seventh grade and dropped out of school in the seventh grade. Mr. Morledge said the Petitioner was enrolled in resource classes from 1982 until he dropped out of school. The school system also conducted a psychological evaluation of the Petitioner, which Mr. Morledge stated would have prompted him to investigate further. He said Ms. Benson obtained records from only one entity within the Memphis City Schools. Ms. Benson did not obtain the Petitioner's special education records and mental health records, which were kept separately from the cumulative records. Mr. Morledge obtained those records and provided them to Dr. Fred Steinberg, a psychologist who evaluated the Petitioner.

Mr. Morledge testified that he reviewed the juvenile records obtained by Ms. Benson and found thirty juvenile complaints involving the Petitioner and his siblings. The records also included assessments, psychological evaluations, and screenings that were conducted as a result of the Petitioner's involvement in juvenile court. Mr. Morledge said the records referred to the impoverished family, his father's alcoholism, and the fights between his

parents.

Mr. Morledge testified that the Petitioner's juvenile records referred to his detentions at the Spencer Youth Development Center and Wilder Youth Development Center. One of the assessments referred to the Petitioner's childhood doctor as LeBonheur. Mr. Morledge said he did not see in the Petitioner's file where Ms. Benson had ever requested the records from LeBonheur. He stated those records showed that the Petitioner suffered severe asthma as a child. A report in the juvenile records stated that the Petitioner almost died as a child as a result of a severe asthma attack.

Mr. Morledge testified that the Petitioner's juvenile court records and his TDOC records referenced mental health issues. School records showed the Petitioner was diagnosed with a learning disability. Mr. Morledge said these records indicated mental health issues that needed to be explored by someone more educated in the field than he was.

Dr. Fred Steinberg, a psychologist, testified that he evaluated the Petitioner at the request of post-conviction counsel and concluded that the Petitioner showed signs of borderline personality disorder. Dr. Steinberg interviewed the Petitioner, conducted psychological testing, and reviewed his mental health records from the jail, the trial record, and his medical records. Dr. Steinberg used the following tests in evaluating the Petitioner: the Wechsler Adult Intelligence Scale, Third Revision (WAIS-III), which measured intellectual capacity; the Wechsler Individual Achievement Test, Second Revision (WIAT-II), which measured what a person has done with that intellectual capacity; the Minnesota Multiphasic Personalty Inventory, Second Revision (MMPI-II), a personality test that defined psychological traits and symptoms; the Rorschach Inkblot Technique Exner System, a personality test; the Luria-Nebraska Neuropsychological Batter Adult Form, a screening test for neuropsychological brain damage; and the Structured Interview of Reported Systems (SIRS), which assessed malingering.

Dr. Steinberg testified that in diagnosing the Petitioner with borderline personality disorder, he used the diagnostic criteria from the DSM-IV TR published by the American Psychiatric Association. He said the criteria required a pervasive pattern of instability of interpersonal relationships, self-image, and moods marked by impulsivity beginning early in adulthood. The pattern needed to be present in a variety of contexts, including five of more of the following:

1.    Frantic efforts to avoid real or imagined abandonment, which did not include suicide or self-mutilating behavior;

2.    A pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and

devaluation;

3. Identity disturbance marked by a persistently unstable self-image or sense of self;

4. Impulsivity in at least two areas that were potentially self-damaging, which could include spending, sex, substance abuse, reckless driving, and binge eating.

5. Recurrent suicidal behavior, gestures, or threats or self-mutilating behavior;

6. Affect of instability due to marked reactivity of mood;

7. Chronic feelings of emptiness;

8. Inappropriate intense anger or difficulty controlling anger; and

9. Transient stress-related paranoid ideation or severe dissociative symptoms.

Dr. Steinberg found the Petitioner experienced six of the nine behavioral issues. The Petitioner did not experience identity disturbance marked by a persistently unstable self-image or sense of self; recurrent suicidal behavior, gestures, or threats or self-mutilating behavior; or chronic feelings of emptiness.

Dr. Steinberg testified that the Petitioner experienced frantic efforts to avoid real or imagined abandonment. He said that according to the evidence presented at the trial, the Petitioner exhibited stalking behavior. He noted testimony at the trial that the Petitioner had a "23/1 kind of situation" with the victim in which he only allowed her to leave their home for one hour each day.

Dr. Steinberg testified that the Petitioner had a pattern of unstable and intense interpersonal relationships. He noted the Petitioner seemed to "go back and forth" on a frequent basis between two different women. Both women alleged incidents of domestic violence against the Petitioner. Dr. Steinberg said his finding was also supported by the psychological testing.

Dr. Steinberg testified that the Petitioner experienced impulsivity in potentially self-damaging areas. His finding was based upon the Petitioner's criminal history and the fact that he had multiple sexual partners even when he was living with a girlfriend. He said his finding was also supported by psychological testing.

Dr. Steinberg testified that the Petitioner had "affect of instability due to marked reactivity of mood." He found the Petitioner had an intense range of emotions based upon the psychological testing, the evidence presented at the trial, and the reports of domestic violence against the victim. He also found that the Petitioner experienced inappropriate

intense anger or difficulty controlling anger based upon the psychological testing and the prior allegations of domestic abuse.

Dr. Steinberg testified that the Petitioner had transient stress-related paranoid ideation or severe dissociative symptoms. He said his finding was supported by the Petitioner's stalking behavior, his medication history and prescription of Haldol, a tranquilizer used to treat psychotic symptoms, in 2003 and 2004 after he was incarcerated for the victim's shooting, and his complaints of visual hallucinations during his incarceration.

Dr. Steinberg testified that the diagnostic criteria were consistent with a borderline personalty disorder with "fleeting very occasional episodes that can be psychotic in nature." He explained that "under high arousal, [the Petitioner] will be prone to more paranoid thinking that is not reality based, necessarily." He stated that the Petitioner reported a lack of trust in all female relationships and that the psychological testing indicated the Petitioner had psychotic thinking underlying his behavior. Dr. Steinberg stated that according to the Petitioner's scores on the MMPI-II test, he was not very defensive and was not complaining excessively, which established that abnormality was part of his daily life. Results from the Rorschach test indicated the Petitioner had mild to moderate impairment in thinking logically and coherently and had a severe impairment in reality testing, which would cause him to misperceive the significance of another's actions. The doctor said that as a result, the Petitioner would fail to anticipate the consequences of his behavior. He said that the Rorschach test illustrated that the Petitioner had little control over his feelings and that some of the data was consistent with psychotic and mood disturbances. Dr. Steinberg found no evidence of malingering.

Dr. Steinberg testified that upon meeting the Petitioner, he did not expect the results obtained from the psychological testing. He said that in speaking with the Petitioner, he did not appear to be suffering from a cognitive disturbance. Dr. Steinberg explained that the Petitioner was "the kind of individual who unless you really did a detailed inquiry about what is his thinking underlying everything, you probably wouldn't know that he had these kind of thought problems."

Dr. Steinberg testified that based upon the diagnosis of borderline personality disorder, he believed the Petitioner was "a remarkably unstable individual who is prone to a very wide swings in mood, short lived, but . . . can have episodes of psychoticism that distort his perception of events." He said that although the Petitioner met the criteria for antisocial personality disorder, the Petitioner experienced episodes of "psychoticism," which was not present in those with antisocial personality disorder.

On cross-examination, Dr. Steinberg testified that he did not make an Axis I diagnosis of schizophrenia, paranoia, or bipolar disorder. Rather, he diagnosed the Petitioner with borderline personality disorder under Axis II. Dr. Steinberg said the Petitioner could react violently if he believed he was being rejected. He stated that evidence showed the victim rejected him and that he stalked her. He explained that in "high arousal" situations, such as the situation involving the victim, the Petitioner could depart from reality and misinterpret the motives of others. He noted testimony at the trial that the Petitioner said, "O[h], bitch, you want me dead, huh," before shooting the victim. Dr. Steinberg said the statement was consistent with the Petitioner's misperceiving the situation but acknowledged that the statement could be consistent with his desire not to return to prison.

Dr. Steinberg testified that the Petitioner was prescribed Haldol after he was convicted of killing the victim. He stated that before the Petitioner was convicted of the offense, the Petitioner never said he was psychotic and was not evaluated for psychosis. He stated that the Petitioner was treated with Haldol until 2004 and did not complain of hallucinations during the evaluation. The Petitioner told the doctor that as a child, he saw people whom no one else could see. Dr. Steinberg suspected the Petitioner was antisocial until he was prescribed Haldol.

Dr. Steinberg testified that the Petitioner was administered the MMPI test and different intelligence tests as a juvenile. He said the assessments were "more psychoeducational" and did not include the testing components that he utilized in evaluating the Petitioner. He also said psychotic disorders generally developed in adulthood.

Dr. Steinberg testified that the Petitioner never told him that he believed the victim was going to kill him or that he shot the victim. Rather, the Petitioner maintained he did not shoot the victim.

On redirect examination, Dr. Steinberg testified that the Petitioner was administered the original MMPI test as a child and that he was very defensive and would not admit to many of the symptoms. The doctor administered the MMPI-II test. He explained that the line of demarcation between abnormal and normal is higher on the MMPI test than the MMPI-II test and that the two tests were administered under different circumstances. Dr. Steinberg stated that borderline personality disorder cannot be diagnosed before the age of eighteen because a person's personality was not yet fully formed. He said that not only was the Petitioner at a different developmental age when he was initially tested, he was potentially at a different stage in his illness.

Dr. Steinberg testified that his diagnosis was supported by psychological testing, the Petitioner's history, and his prior prescription history. He did not believe the Petitioner's illness would have been discovered absent a forensic evaluation.

Upon questioning by the trial court, Dr. Steinberg testified that the Petitioner had a "transient mental illness." He would not characterize the Petitioner's condition as a defect but as "transient psychosis." The doctor explained that when the symptoms of psychosis occurred, they were severe and disruptive and bore upon the Petitioner's ability to confront reality. He stated that his diagnosis did not support an insanity defense and did not establish diminished capacity.

The Petitioner testified that he had separate charges for aggravated assault and first degree murder involving the same victim. He said trial counsel told him that the aggravated assault charge would be tried on May 5, 2002, and that the murder charge would be tried in 2003. He said counsel never told him that the murder charge would be tried first.

The Petitioner testified that the victim claimed he knocked her out, took her behind Mapco, and beat her. He said he told trial counsel that fences on both sides of Mapco prevented anyone from walking behind the store. He said trial counsel never told him this information was investigated and never used the information at the trial. The Petitioner also drew a map of the location which showed that Hanley Street, where the victim claimed to have regained consciousness, was located approximately one mile from Mapco. He said counsel never used the map at the trial.

The Petitioner testified that he requested trial counsel investigate the incident at Magnolia Place Apartments. He said he told counsel that Ms. Cupp, the manager, lived next to victim's the apartment and could verify that he did not kick open the door. Counsel did not interview her. The Petitioner said he also asked counsel to interview Desi Hall and a man who lived at the apartment complex and always kept his door open. He said he also told counsel of the placement of the doors at the apartment complex.

The Petitioner testified that Ms. Hunt said she identified the assailant from his "droopy-like eyes." He said that he requested trial counsel cross-examine her as to how she could identify the assailant just based upon his eyes but that counsel failed to do so. He complained of counsel's cross-examination of witnesses stating:

And I had also told [counsel] in my trial to ask the State key witness about the identification saying that I had this scar on the side of my face that I had since I was a child. And I also had golds at the top and bottom of my mouth, and she never made any identification of that when she said she seen the person

-25-

whole face as well as his smile.

He said he asked counsel to interview Cavette Mason or Cavette Briars, who would have provided an alibi, and his brother, Robert, who would have stated he was repairing the Petitioner's car at the time of the shooting.

The Petitioner testified that after he was convicted and during a recess, trial counsel told him they planned to call his mother as a witness to testify about his father's abusiveness. He said that counsel never discussed mitigation with him and that he did not understand why they wanted to call his mother as a witness to "belittle" his father. He said he met with Ms. Benson only once.

On cross-examination, the Petitioner testified that he expected trial counsel to continue working on his case after he escaped from jail. He never called counsel from California to check on the case. He acknowledged counsel provided him a copy of the discovery materials received from the State and discussed it with him. The Petitioner said he did not testify at the trial because counsel told him that his criminal record would be used against him.

In response to questioning by the trial court, the Petitioner testified that when he escaped from jail, he remained in California for two months. He was arrested in California and brought back to Tennessee. He said his prior record consisted of convictions for second degree murder, especially aggravated robbery, possession with the intent to sell cocaine, felony escape, and multiple convictions for aggravated assault.

Yvonnie Johnson testified that she had worked for thirteen years at Mapco Express located on the corner of Park and Airways Boulevard in Memphis. She worked either from 6:00 a.m. to 2:00 p.m. or from 7:00 a.m. to 3:00 p.m. She could not recall whether she was working on June 6, 2001. Ms. Johnson did not recall an assault outside the store in June 2001 or anyone asking her to call the police or complaining of injuries. After being shown a photograph of Mapco, she said she believed the fences enclosing the back of Mapco had been there since she began working there in 1996.

Desi Hall testified that he grew up with the Petitioner and the victim. He said he accompanied the Petitioner to the victim's apartment at Magnolia Place Apartments to help him move furniture. Mr. Hall said that when they arrived at the apartment, the victim was not there but that one of her sisters was there. He said the Petitioner used a key to enter the apartment.

Mr. Hall testified that while they were moving furniture, police officers and the victim arrived. He said the Petitioner showed the officer documents that appeared to be receipts or some type of evidence showing the furniture was his. The officer allowed the Petitioner to retrieve his belongings.

Mr. Hall testified that the "front door" and the "back door" of the apartment were located side by side at the front of the apartment. He did not recall breaking any items or seeing broken glass in the living room. He did not remember seeing any damage to either door. He said no one interviewed him in 2001.

Ruby Ivy, the Petitioner's sister, testified that no one from the defense team contacted her before the trial. She said that during the trial, Ms. Benson told her that she wanted her to be a character witness for the Petitioner and to say negative things about her father. Ms. Ivy said she would not "talk against" her father. She stated that she grew up with the Petitioner and could have testified about matters other than those that reflected negatively upon her father.

Upon questioning by the trial court, Ms. Ivy testified that she offered brief testimony at the trial about the type of child the Petitioner was. On cross-examination, Ms. Ivy stated that at the trial, she testified about how children loved the Petitioner and how the Petitioner loved musical instruments. She said she attempted to paint a good picture of the Petitioner and asked the jury not to sentence him to death.

Joyce Ivy, the Petitioner's sister, testified that she first spoke to trial counsel while at court for the preliminary hearing. Counsel asked that she gather a list of character witnesses and contact information and provide it to the investigator. She stated that once she gathered the information, she attempted to contact the investigator but that he never returned her calls. She eventually disposed of the list.

Ms. Ivy testified that Ms. Benson did not contact her until one week before the trial and that she did not explain mitigation to her. She said that approximately thirty minutes before the trial, trial counsel and Ms. Benson gathered the Petitioner's family together and asked who was willing to testify as a character witness. Ms. Ivy said she volunteered to testify but was not chosen.

Ms. Ivy testified that trial counsel did not tell the Petitioner's family to testify regarding the history of abuse until the day of the trial. She stated that the topic was not freely discussed in her family and that they typically did not disclose the history of abuse to someone upon first meeting them.

Upon questioning by the trial court, Ms. Ivy testified that trial counsel only questioned the family in general terms about the abuse. She said she would have discussed it if it would have helped the Petitioner.

Gerald Skahan, a criminal defense attorney, testified that he had tried more than twenty capital cases. He said that when appointed to a capital case, he met with the client and obtained as much information as possible. He located an attorney to serve as co-counsel, a fact investigator, and a mitigation specialist. He met with them and the client to identify necessary experts.

Mr. Skahan testified that he directed the investigator to a certain extent and met with the investigator on a regular basis once he received discovery material from the State. He believed it was important to investigate any prior bad acts beginning with the victim of those bad acts. He did not believe he had ever "hit a dead end" in his investigation. Mr. Skahan said, "There's always more people to talk to, always." He also stated, "I never get to a point where I'm comfortable having done everything I should have done."

Mr. Skahan testified that mitigation evidence in a capital case was more important than the evidence presented in the guilt phase. He said a mitigation specialist needed to know how to gather and read records. The specialist should have the ability to communicate with the client and his family and gain their trust. Mr. Skahan said a mitigation specialist should know how to put people at ease so that they will discuss negative things in their family's history. A mitigation specialist must examine school records and juvenile records, discuss the records with counsel and the client, investigate medical injuries, and talk to teachers and expert witnesses.

On cross-examination, Mr. Skahan testified that any trial attorney would likely say that he or she did not feel ready for a trial when it was set to begin. In response to questioning by the trial court, he said he had been assigned four or five capital cases at one time, which he believed was too many. He stated that an attorney who only represented capital defendants could handle five capital cases at one time.

## TRIAL COURT'S FINDINGS

At the conclusion of the post-conviction hearing, the trial court issued a written order denying the Petitioner relief. The court denied the Petitioner claims of (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; and (3) errors at the trial.

### 1. Ineffective Assistance at the Trial

The trial court found that counsel were not ineffective in failing to present the testimony of Callie Haley as a trial witness. The court noted the Petitioner failed to call her as a witness during the post-conviction hearing but presented her statement to the police. Ms. Haley described the shooter as 5'4" tall and said he never lowered the towel covering his face. The court found that Ms. Haley refused the defense's requests for an interview. The court noted that although aspects of her statement might have contradicted the testimony of other witnesses, portions of her statement also corroborated the eyewitnesses' testimony. Trial counsel testified that he investigated the details of Ms. Haley's statement and did not believe that she was a useful or credible witness because she was too far from the shooting to make an identification. The court found counsel "adequately investigated the details provided by Haley; appropriately attempted to interview the witness; and after evaluating the situation determined that her testimony would not be helpful to the defense." The court refused to second guess counsel's "reasoned, tactical decision."

The trial court found that even if counsel was deficient in failing to call Ms. Haley as a witness at the trial, the deficiency did not prejudice the Petitioner. The court noted that in addition to testimony from eyewitnesses, the jury heard "substantial" testimony regarding the Petitioner's motive and prior incidents of domestic violence against the victim. The court found that "even if the jury heard the minor inconsistencies between Haley's description of the events and the testimony of Hunt and Bland, the jury would not have reached a different conclusion as to the Petitioner's guilt."

The trial court found that counsel were not ineffective in failing to interview and present Desi Hall as a witness regarding the incident at Magnolia Park Apartments. The court noted Mr. Hall's testimony at the post-conviction hearing was consistent with Officer Alvin Clark's testimony at the trial. With the exception of the broken glass, which Mr. Hall did not recall, the only inconsistency between Mr. Hall's testimony and Officer Clark's testimony related to claims by the victim. The court noted Officer Clark's testimony that he did not see the Petitioner threaten the victim and did not see any damage to the door. The court found that Mr. Hall's testimony contradicted the victim's version of the events as presented by Officer Clark, Ms. Bland, and Ms. Hall. The court, however, found that the Petitioner was not prejudiced by counsel's failure to call Mr. Hall as a witness. According to the court, "given the breadth of testimony regarding the tumultuous and violent relationship between the petitioner and the victim," it did not find that Hall's testimony would have affected the verdict.

The trial court found counsel were not ineffective in failing to call Tasha Cupp, the manager of Magnolia Place Apartments, as a witness at the trial. The court noted that the Petitioner did not call Ms. Cupp as a witness at the post-conviction hearing and that no evidence was presented about what Ms. Cupp would have stated had she testified at the trial.

The trial court found counsel were not ineffective in failing to present testimony at the trial from a Mapco employee. The court stated that although the defense team attempted to investigate the allegation of a prior altercation between the Petitioner and the victim, they were unable to locate employees or other witnesses to the altercation. The court noted the video surveillance footage from the date of the assault no longer existed. The court found that the Petitioner was not prejudiced by counsel's failure to present the witness at the trial. The court stated that Ms. Johnson testified at the post-conviction hearing that she did not witness the altercation and that "her testimony would have offered nothing of real relevance to the case."

The trial court found that counsel were not ineffective with regard to their investigation into the incident at Joe's Liquor Store. The court credited the testimony of trial counsel and Mr. Nally that they went to Joe's Liquor Store. The court noted Mr. Nally testified that he interviewed those who witnessed the altercation and obtained a videotape of the incident, which he viewed before the trial. The court found that counsel adequately investigated the altercation and cross-examined Frank Sullivan regarding the creation and editing of the tape and his recollection of the incident.

The trial court rejected the Petitioner's contention that trial counsel was ineffective in his opening statement by making statements that he knew or should have known to be untrue regarding witnesses' prior identifications. The court found that while counsel's statements "could have been phrased more artfully," he told the jury that the defense would be challenging the ability of the State's witnesses to identify the shooter. The court noted that Ms. Bland testified at the trial that she did not see the shooter's face but that the build of the shooter resembled the Petitioner. Counsel strongly challenged this testimony on cross-examination. The court noted that trial counsel also challenged Ms. Hunt's testimony that the shooter looked like the Petitioner and that she identified the shooter as the Petitioner when he pulled the towel down from his face and spoke to the victim. The court did not find that counsel's tactical decision to challenge the eyewitness identification was unreasonable.

The trial court found counsel were not ineffective in failing to challenge the chain of custody of bullets and bullet fragments recovered by agents for the Tennessee Bureau of Investigation (TBI) and Dr. O.C. Smith, the medical examiner. The court noted Officer Danny James testified to recovering bullet fragments and bullet casings from the victim's car and to his procedures for documenting and collecting evidence. He properly identified the evidence at the trial before it was admitted. The trial court stated that TBI Agent Heath Barker said he received a request from the State to review certain evidence and explained the procedures for receiving evidence and maintaining chain of custody. The court noted that Dr. Smith recovered bullet fragments from the victim's body and that the evidence was maintained by the Medical Examiner's Office until the trial. At the trial, Dr. Smith removed

the items from sealed envelopes and testified regarding where and how the fragments were removed from the victim's body.

The trial court rejected the Petitioner's argument that counsel failed to impeach Ms. Hunt properly at the trial with her prior statement to the police and her testimony at the preliminary hearing. The court noted that in other statements, Ms. Hunt said she was able to identify the Petitioner as the shooter even though he kept his face hidden and that at the trial, Ms. Hunt testified she identified the Petitioner as the shooter after he lowered the towel and spoke to the victim. The court found that counsel addressed this discrepancy, as well as "marginal" discrepancies between Ms. Hunt's description and Ms. Bland's description of the shooter on cross-examination.

The trial court also rejected the Petitioner's argument that counsel failed to impeach Ms. Bland properly at the trial with her prior statements. Ms. Bland testified that she did not see the shooter's face but that the shooter's build resembled that of the Petitioner. The court found that counsel challenged Ms. Bland's ability to make this observation and her description of the shooter.

The trial court found that trial counsel adequately cross-examined Officer Alvin Clark regarding his observations while investigating the victim's murder and the prior incident at the victim's apartment. The court also found that any discrepancies in Officer Clark's previous statements were "slight" and that the Petitioner was not prejudiced by any deficiency in trial counsel's cross-examination of the officer.

The trial court found that trial counsel was not deficient in failing to have the Petitioner evaluated by a mental health expert for purposes of the guilt phase of the trial. The Petitioner's mother told Ms. Benson that there was no history of mental illness in her family and that to her knowledge, the Petitioner had never been treated for serious medical or mental health issues. The court noted trial counsel's testimony that although he did not recall why the Petitioner was not evaluated, the records the defense obtained must not have demonstrated a need for the evaluation. Counsel saw no indication that the Petitioner had any mental health problems and did not believe he could have established a particularized need for mental health services. The court stated that although Mr. Morledge testified the Petitioner's school records showed he was enrolled in resource classes, his I.Q. was in the mid-eighties. The court found that although some of the juvenile records showed that family members had undergone various psychological assessments, the records were insufficient to establish a particularized need for the evaluation pursuant to Tennessee Supreme Court Rule 13.

The trial court found that even if trial counsel were deficient in failing to have the Petitioner evaluated by a mental health professional, the deficiency did not result in prejudice. The court explained:

> Dr. Steinberg testified the petitioner suffers from borderline personality disorder. He stated that this condition would not have established an insanity defense or defense of diminished capacity. Additionally, he testified that such condition was characterized by a pattern of unstable and intense interpersonal relationships; impulsivity; instability and inappropriate, intense anger or difficulty controlling anger. He further testified that his findings were supported by evidence that petitioner stalked the victim; would only allow the victim to leave their residence for one hour a day; had a history of domestic abuse; had multiple sexual partners at the same time; and, had a violent criminal past. Finally, Dr. Steinberg testified that petitioner does not exhibit outward signs of cognitive disturbance. Although, Dr. Steinberg testified the petitioner's condition makes it difficult for him to think logically or anticipate the consequences of his behavior, this court does not find such testimony to be particularly mitigating, in light of the strength of the State's aggravating circumstances, and Dr. Steinberg's opinion that petitioner suffered from a personality disorder that caused him to display intense anger and react violently when rejected emotionally.

The trial court also found that counsel were not ineffective in failing to have the Petitioner evaluated for purposes of mitigation. The court noted that members of the defense team testified that they did not believe the Petitioner had mental health issues that required further evaluation and did not find anything in the Petitioner's background to suggest further investigation into his mental condition was necessary. The court found that counsel likely would not have been able to establish a particularized need for the services. The court also found the failure to request the services was not prejudicial because Dr. Steinberg's diagnosis and testimony were not particularly helpful to the Petitioner, given the circumstances of the offense.

The trial court rejected the Petitioner's contention that counsel failed to investigate adequately and present mitigation evidence. The court credited trial counsel's testimony noting:

> [Trial counsel] testified that they understood that mitigation would be important in petitioner's case. He testified that the defense team attempted to put before the jury proof that the petitioner had a family who cared for him; that he had a child that he cared for; and that the family was asking for mercy.

[Counsel] testified that, given the circumstances of the offense, he did not introduce certain prison records because he did not find that petitioner's certificates for anger management or substance abuse would have been helpful in mitigation. [Counsel] explained that their strategy for mitigation was hampered by the fact that petitioner was not cooperative during the sentencing phase of his trial and refused to testify and by the fact that petitioner's family made specific references to petitioner's good character even though they had been warned not to do so. [Counsel] explained that by doing so, the family opened the door to allowing the State to put forth negative aspects of the petitioner's character.

The court found that counsel developed a mitigation strategy, investigated potential avenues of mitigation, and presented evidence that they believed would be the most beneficial to the Petitioner.

The trial court found that counsel were not ineffective in failing to object to the State's closing argument in which the State named the Petitioner's victims in his prior convictions, argued that the victim's murder was part of a "master plan," and contended that the death penalty was necessary to prevent him from committing additional offenses against members of the community. The court noted the State's arguments were appropriate and were not so inflammatory to influence the jury's sentence "unduly."

## 2. Ineffective Assistance of Appellate Counsel

The trial court rejected the Petitioner's claim that appellate counsel was ineffective in failing to challenge the prosecution's closing argument on appeal as plain error. The court found that the closing arguments in both phases of the trial were not so prejudicial as to require a new trial. The court also rejected the Petitioner's claim that counsel was ineffective in failing to withdraw as counsel or to file a writ of certiorari in the United States Supreme Court. The court found that counsel's action fell below the standard of representation required of attorneys in Tennessee but that due to the Tennessee Supreme Court's holding in this case and prior opinions from the United States Supreme Court, it was unlikely that certiorari would have been granted.

## 3. Trial Errors

The trial court found no error in the State's reliance upon prior convictions resulting from a plea pursuant to North Carolina v. Alford, 400 U.S. 25 (1970), to establish the prior violent felony aggravating factor. The court stated,

The critical inquiry is not whether [the] petitioner has attested to the underlying facts of the prior conviction, the question is what are the underlying facts supporting the conviction and are those facts documented in such a manner as to allow the court to make the appropriate determination regarding whether the offense involved the use of violence to the person.

The court further noted the Tennessee Supreme Court stated on direct appeal that although the trial court erred in instructing the jury that two of the Petitioner's convictions for aggravated assault were crimes of violence, the error was harmless in light of the fact that the State had properly relied upon three other felony convictions involving the use of violence to a person to establish the aggravating circumstance. The court also rejected the Petitioner's claim that his underlying felonies were void because the court failed to inform him that they could be used in the future to enhance his sentence, finding that this post-conviction proceeding was not the proper avenue for attacking those prior convictions.

The trial court found that the prosecution did not commit prosecutorial misconduct in their closing arguments during both phases of the trial. The court noted the argument did not violate constitutional standards and was not so prejudicial as to undermine the jury's verdict. The court also rejected the Petitioner's constitutional challenges to the death penalty.

## BURDEN OF PROOF AND STANDARD OF REVIEW ON APPEAL

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. See T.C.A. §§ 40-30-101 to -122 (2012). To obtain post-conviction relief, the Petitioner must prove that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. See T.C.A. § 40-30-103. The Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. See T.C.A. § 40-30-110(2)(f) (2012). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The trial court's findings of fact are conclusive on appeal unless the evidence preponderates against them. Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The Petitioner has the burden of establishing that the evidence preponderates against the trial court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Nichols, 90 S.W.3d at 586. The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Id.

Claims of ineffective assistance of counsel are regarded as mixed questions of law or fact. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461. The trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the evidence preponderates against the findings. Fields, 40 S.W.3d at 458 (citing T.R.A.P. 13(d)). A trial court's conclusions of law are reviewed de novo with no presumption of correctness. Id.

## ISSUES ON APPEAL

On appeal, the Petitioner contends that he is actually innocent of the offense, that trial counsel was ineffective during both the guilt and penalty phases of the trial, that appellate counsel was ineffective on appeal, that the trial court committed multiple errors during the trial, that the Shelby County Public Defender's capital case team was constitutionally ineffective, and that the death penalty is unconstitutional.

## I. Actual Innocence

The Petitioner's claim that he is actually innocent of the victim's murder is not based upon new scientific evidence establishing actual innocence but upon the testimony of witnesses at the post-conviction hearing. The Tennessee Supreme Court has recognized that the Post-Conviction Procedure Act provides for freestanding claims of actual innocence based upon new scientific evidence. See Dellinger v. State, 279 S.W.3d 282, 290 (Tenn. 2009). A claim of actual innocence that is not based upon scientific evidence, however, may not be raised in a post-conviction relief petition. See Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, slip op. at 42 (Tenn. Crim. App. July 1, 2009), perm. app. denied (Tenn. Dec. 21, 2009). Such claims may be brought in a petition for writ of error coram nobis or in an application for executive clemency. Dellinger, 279 S.W.3d at 290 n.7.

Even if a claim based upon new non-scientific evidence establishing actual innocence were recognized in a post-conviction proceeding, the Petitioner would not be entitled to relief. To establish actual innocence, "a petitioner must establish by clear and convincing evidence that no jury would have convicted him in light of the new evidence." Perry Anthony Cribbs, slip op. at 42. The Petitioner failed to establish by clear and convincing evidence that no jury would have convicted him in light of the evidence presented in the post-conviction hearing.

## II. Ineffective Assistance of Counsel at the Trial

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

In evaluating whether a petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing

Strickland, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." Nichols, 90 S.W.3d at 587. That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Id. When challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695).

The Petitioner contends that counsel were ineffective during the guilt phase of the trial in (1) making inaccurate statements during opening statements; (2) failing to interview and present witnesses; (3) failing to object to evidence presented by the State; (4) failing to properly cross-examine witnesses; and (5) failing to object to the State's closing argument. The Petitioner asserts that counsel were ineffective during the penalty phase of the trial in (1) failing to have the Petitioner evaluated by a mental health professional and to present the result of the evaluation as mitigation evidence; (2) failing to present proof of his background as mitigation evidence; (3) failing to object to the State's closing argument; and (4) failing to object to the use of the Petitioner's prior convictions to support the prior violent felony aggravating circumstance.

## A. Guilt Phase

### 1. Inaccurate Opening Statements

The Petitioner asserts that trial counsel made statements during his opening statement regarding witnesses' identification of the Petitioner as the shooter that counsel knew or should have known to be untrue. According to the Petitioner, these statements damaged both his and trial counsel's credibility, and the damage was never corrected.

In his opening statement during the guilt phase of the trial, trial counsel stated as follows:

> Ladies and gentlemen of the jury, this is the time that we do something that is humanly remarkable. We try to predict the future. We try to predict the evidence that you'll be presented with and the testimony of the witnesses as they come from the witness stand. Now, my belief about what will be testified to in this case is that on June 8th of 2001, about a year and a half ago, Lakisha

Thomas was in a car at the Millbranch Park Apartments, 3602 Millbranch. I believe that's south of Millbranch and Winchester. She was seated in the car at about 11:00 o'clock. Andrea Mitchell was also there and seated in the car. And also Jackie Bland or Jacqueline Bland I think is her true name possibly claims to have witnessed this event. Neither Andrea nor Jackie will tell you that they were in a position to see the face of the person who shot Lakisha Thomas. Neither one was in a position to see the entire face of that person. I believe the testimony will be that Andrea while seated in the back seat saw somebody running with a black cap on, a black baseball cap, and underneath that black baseball cap that there was a towel somehow draped over the face of this assailant. There will not be anybody here that says they saw David Ivy or recognized anybody else as that person.

The prosecutor then requested permission to approach the bench. During the bench conference, the following discussion occurred:

PROSECUTOR: Judge, we've had a preliminary hearing in this matter where Andrea testified she saw the defendant's face and it was him and I don't think there's any basis for the defense attorney saying what he's saying.

[CO-COUNSEL]: She doesn't say that in the preliminary hearing. She says that there's a towel over his face and at some point he pulls the towel down. But the whole time at the preliminary hearing she's being asked where is the towel and she's like, "It's here. It's here." So, yes, in the preliminary that we have a transcript and a tape of does say that he has a towel over his face.

PROSECUTOR: But also she clearly identifies him and says he pulled his face down and talks.

THE COURT: [Counsel] just said that nowhere in this proof will anyone identify your client as being the person who is the shooter. That is not the case from the preliminary hearing.

[CO-COUNSEL]: No.

THE COURT: That's the statement that [the prosecutor] is objecting to. That's a pretty definitive statement. That doesn't leave any room for ambiguity. He clearly stated that nowhere in this proof will anyone claim to be able to identify your client as the shooter and apparently that's not the case.

[CO-COUNSEL]: I thought he was just referring to the towel.

THE COURT: No.  The most recent statement that [counsel] said.

PROSECUTOR: And he also said nobody was in a position to see him.  She clearly testified that he brought the towel down.  He spoke.  He laughed.  And he shot her.  She saw it.  She positively unequivocally identified him.

THE COURT: Was that the case?

[CO-COUNSEL]: That may be in her statement but that's not in the prelim.  So that may be what he's referring to since we don't have a statement, Judge.

THE COURT: Did she identify him at the prelim?

[COUNSEL]: Yes, she did.

THE COURT: Well, so how does a statement like that that is so directly opposite from the prelim said come out of your mouth?

[COUNSEL]: I'm trying to say nobody saw the full face of the defendant and I apologize to the Court.

THE COURT: Okay.  Rephrase.

At the conclusion of the bench conference, the trial court gave the following instruction to the jury:

Ladies and gentlemen, let me remind you that ultimately the proof on which you will base your verdict will come from the witness stand and what the lawyers say is not evidence.  You may proceed.

Counsel proceeded with his opening statement as follows:

And both of those witnesses *I believe* will testify–they will elaborate on the basis for their identification in this case if they make any. . . .

(Emphasis added.)

The Petitioner relies on State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991), to argue that trial counsel's statements constituted ineffective assistance of counsel. In Zimmerman, counsel told the jury during opening statements that the defendant was a battered and abused wife who had killed her husband in self-defense and that the defendant would testify at the trial. Zimmerman, 823 S.W.2d at 224-25. During the trial, counsel advised the defendant to "shut down" the defense and not to testify. This court held that the sudden change in the defense constituted ineffective assistance of counsel under the circumstances of the case. Id. This court noted that nothing changed during the course of the trial to justify counsel's decision to abandon the defense. Id. at 224, 226.

In the present case, though, counsel did not abandon a defense during the trial. Trial counsel testified at the post-conviction hearing that the defense was based upon challenging Ms. Bland's and Ms. Hunt's identifications of the shooter. Counsel cross-examined both witnesses about their ability to identify the Petitioner as the shooter. During closing arguments, trial counsel identified the inconsistencies in the witnesses' testimony and challenged their identifications of the shooter. Counsel's opening statement was an attempt to express the defense theory.

In Zimmerman, this court acknowledged that overstatement or misstatement during opening statements may have adverse effects despite a curative instruction from the trial court. Id. "'The trial attorney should only inform the jury of the evidence that he is sure he can prove. . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation." Id. (quoting McCloskey, Criminal Law Desk Book, § 1506(3)(O) (Matthew Bender, 1990)). Trial counsel, however, did not make a "promise" to the jury in his opening statement. He attempted to predict the evidence and described the evidence in terms of his beliefs rather than in absolute terms. While we agree with the trial court that counsel's opening statement "could have been phrased more artfully," we conclude that his choice of words did not constitute deficient performance. In any event, we conclude that trial counsel's statements did not result in prejudice in light of the evidence supporting the Petitioner's guilt.

## 2. Failure to Interview and Present Witnesses

The Petitioner contends that counsel were ineffective in their investigation into the facts and circumstances of his case. Although counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to conduct a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs, slip op. at 57 (addressing mitigation investigation). "Reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. Moreover,

the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691.

To succeed on a claim of ineffective assistance of counsel for failure to call a witness at the trial, a petitioner should present that witness at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id. Once a petitioner presents a witness at the post-conviction hearing who he claims should have been called at the trial, the trial court must determine whether the testimony would have been (1) admissible at the trial and (2) material to the defense. Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). The trial court is justified in finding that trial counsel was not deficient in failing to call a witness at the trial if the trial court determines that the witness' testimony would have been inadmissible at the trial or that, even if admissible, would not have materially aided the petitioner's defense at the trial. Id. If the proffered testimony is both admissible and material, the trial court must assess the credibility of the witness. Id. at 869-70.

The Petitioner denied shooting the victim and told counsel he was in another state at the time of the shooting. Mr. Nally obtained records of the victim's domestic violence complaints against the Petitioner and visited the scene of the shooting. Counsel were aware

of the victim's statements to others alleging violence and threats of violence by the Petitioner against her. Counsel questioned Ms. Hunt during the preliminary hearing regarding her observations at the time of the shooting and received Ms. Haley's statement to the police in discovery. Although Ms. Hunt refused requests for an interview, Mr. Nally was aware that the Petitioner had threatened Ms. Hunt because she testified against him at the preliminary hearing. Mr. Nally and trial counsel visited Magnolia Place Apartments, Hanley Street, Mapco, and Rally's to investigate the victim's allegations of violence and threats by the Petitioner. Mr. Nally obtained a video recording of the incident at Joe's Liquor Store. Counsel continued their investigation and preparation for the trial even after the Petitioner escaped from jail and admittedly failed to contact counsel for the two months he remained at large in California.

Counsel also investigated the Petitioner's claims of an alibi at the time of the shooting. They filed a notice of alibi stating that the Petitioner was in Springdale, Illinois, at the time of the shooting and listed Cavette Briars, Chris Williams, and Vicki Crawford as witnesses. The notice listed addresses for Mr. Briars and Mr. Williams in Covington, Tennessee, and a Memphis address for Ms. Crawford. Trial counsel testified that he was unable to locate the alibi witnesses. Mr. Nally testified that he spoke to someone identified by the Petitioner as an alibi witness but that the person was unable to provide an alibi. Ms. Crawford testified for the defense at the trial but never stated that she was with the Petitioner in Illinois on the night of the shooting. The State filed a response to the notice of an alibi, including a statement of Sergeant Shannon Beasley of the Tipton County Sheriff's Department saying that Reginald Cavat Mason, the son of Calvin Briars, told Sergeant Beasley that the Petitioner had attempted to persuade him to commit perjury by falsely providing an alibi for the time of the shooting. The State also presented Sergeant Beasley's testimony through an offer of proof at the trial.

Despite the Petitioner's actions in hindering counsel's preparation for the trial and presentation of a defense by escaping to California for two months, threatening a witness, and attempting to persuade someone to provide a false alibi, counsel presented a defense challenging the witnesses' identification of the Petitioner as the shooter. This defense was consistent with the Petitioner's assertion of innocence. The Petitioner, however, contends that counsel were ineffective in failing to investigate adequately the incidents at Magnolia Place Apartments, Mapco, and Joe's Liquor Store and in failing to interview and call Callie Haley as a witness at the trial.

### a. Magnolia Place Apartments

At the trial, Deborah Kelley recalled the Petitioner's moving out of the victim's apartment at Magnolia Place Apartments before the victim's death. Ms. Kelley testified that

the victim called her and said that the Petitioner had broken a glass table and that police officers were en route to the apartment.

Ms. Bland testified that the victim called her and said the Petitioner had kicked open the door to the apartment and had broken all of the tables. She said the victim came to her residence and called the police to accompany her to the apartment. According to Ms. Bland, the victim did not want to go to the apartment alone because she was afraid the Petitioner would try to injure her. On cross-examination, Ms. Bland testified that the victim drove to the apartment complex, saw the Petitioner's car, and then drove to Ms. Bland's home to call the police. When the victim came to her residence to call the police, she said the victim had not been inside the apartment and did not know that anything was broken. Ms. Bland also said that she believed the Petitioner was still living at the apartment at the time and that the victim was staying either with her or the victim's grandmother.

Officer Alvin Clark testified at the trial that he responded to the call and went to the apartment complex. The victim reported that the Petitioner forced his way into her apartment, moved items out of the apartment, and threatened to kill her. Officer Clark said the victim was nervous and appeared to be afraid to make eye contact with the Petitioner. He said that while inside the apartment, the victim held his forearm so tight at times that he had to tell her to loosen her grip.

Officer Clark testified that the Petitioner and two other men were moving furniture. He said the Petitioner did not threaten the victim while he was there. He saw broken glass in the middle of the floor but did not see damage to the doors. On cross-examination, he stated that he did not see any damage to the apartment. He said the Petitioner was not angry and did not threaten or intimidate the victim.

The Petitioner argues that counsel should have interviewed and presented Desi Hall as a witness to challenge Officer Clark's testimony and the victim's allegations. As the trial court found, however, Mr. Hall's testimony at the post-conviction hearing was almost entirely consistent with Officer Clark's testimony. Moreover, evidence was presented at the trial contradicting the victim's version of the event. Officer Clark, like Mr. Hall, contradicted the victim's claims that the Petitioner kicked open the door because he did not see any damage to the door. Ms. Bland's testimony on cross-examination that she believed the Petitioner was living in the apartment called into question the victim's claim that the Petitioner forced his way into the apartment. Mr. Hall did not witness the other bad acts and could not have challenged the testimony of other witnesses regarding those bad acts, the victim's injuries, and her fear of the Petitioner.

The standard for determining prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see Smith, 357 S.W.3d at 337. The trial court's order does not include an earlier reference to the correct legal standard. See Dellinger, 279 S.W.3d at 294 (holding that the trial court's "imprecise" statement did not constitute a misapplication of the law as the trial court's order included an earlier reference to the correct legal standard); Fields, 40 S.W.3d at 458 (concluding that this court's misstatement of the law was "one of imprecision in the use of its language" rather than a misapplication of the law as this court included an earlier reference to the correct standard under Strickland).

Nevertheless, the determination of whether counsel's deficiency was prejudicial is a conclusion of law that is reviewed under a de novo standard with no presumption of correctness given to the conclusions of the trial court. Id. at 458. Based upon our de novo review of the record, we conclude that there is no reasonable probability that the results of the trial would have been different had counsel presented Mr. Hall's testimony.

The Petitioner faults trial counsel for failing to impeach Officer Clark's description of the apartment as having a back door when photographs showed both doors on the same side of the apartment. Trial counsel testified that it was not unusual for an apartment to have two doors in the front with one called the "front door" and the other called the "back door." We conclude that these photographs would not have impeached Officer Clark's testimony.

The Petitioner argues that counsel were ineffective in failing to call Ms. Cupp or any other witness to refute the victim's claim that the Petitioner damaged the apartment and in failing to obtain maintenance records from the apartment complex. The Petitioner did not present testimony from Ms. Cupp or any other such witness at the post-conviction hearing. Therefore, the Petitioner cannot establish that counsel were ineffective in failing to call these witnesses at the trial. See Black, 794 S.W.2d at 757. Furthermore, any evidence showing the door was not damaged would have been cumulative to Officer Clark's testimony at the trial because he did not see any damage to the door. The Petitioner is not entitled to relief on this issue.

### b. Mapco

At the trial, Ms. Kelley testified that a few days before the victim's death, she saw the victim with multiple injuries. She said the victim told her that earlier that morning, the Petitioner blocked her car in the parking lot of a Mapco and hit her on the head with a pistol. The victim said she awoke in the passenger seat of her car, which was parked on Hanley Street.

Ms. Bland testified that the victim told her that while she was inside Mapco, the cashier told her that someone was blocking her car. The victim said that when she went outside, the Petitioner grabbed her, took her behind the building, and hit her in the head with a gun. The victim told Ms. Bland that she awoke in the passenger side of her car parked on Hanley Street.

Officer Steve Cummings testified that he responded to a domestic assault complaint. He said the victim reported that the Petitioner assaulted her in the area of Park and Airways with a black "Uzi type" pistol with a long magazine. The victim's injuries included a two-inch laceration on the top of her head, a black eye, and bruises above her left breast.

The Petitioner contends that counsel were ineffective in failing to call any employees from Mapco to refute the victim's allegations. The trial court found that counsel investigated the allegations but were unable to locate employees or other witnesses to the incident. They also attempted to obtain video surveillance footage of the incident from both Mapco and Rally's, which was located across the street, but the footage no longer existed. Ms. Johnson did not testify at the post-conviction hearing that the incident did not occur. Rather, she said she did not recall the incident or whether she was working the day of the incident. The court found that Ms. Johnson's testimony "would have offered nothing of real relevance to the case." We agree.

The Petitioner contends that counsel should have presented evidence that the fences enclosing the back yard of the Mapco prevented him from taking the victim behind the Mapco as she alleged. He also argues that counsel should have presented evidence that Hanley Street was not "the next street over" as described by the victim. This evidence, though, does not call into question whether the Petitioner beat victim behind Mapco causing her to lose consciousness or whether she awoke in the passenger seat of her car parked at a different location.

The Petitioner faults counsel for agreeing to continue the trial for the assault charge relating to the Mapco incident until after the murder trial. While the Petitioner raised the claim in his written "Closing Argument and Summation of Proof" submitted to the trial court after the evidentiary hearing, he did not raise the issue in his initial or amended post-conviction relief petition. See T.C.A. § 40-30-106(d) (2012) ("The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds."). Moreover, in contending that the assault charge should have been tried first, the Petitioner assumes that he would have been acquitted of the charge. The Petitioner's assumption is speculative and irrelevant. Therefore, the Petitioner is not entitled to relief regarding this issue.

### c. Joe's Liquor Store

The Petitioner contends that counsel were ineffective in failing to investigate the incident at Joe's Liquor Store and in failing to review a surveillance videotape submitted at the trial. The trial court found that Mr. Nally interviewed witnesses to the incident and obtained a videotape of the incident. Counsel cross-examined witnesses regarding their recollection of the incident and a store employee regarding the creation and editing of the tape.

The Petitioner argues that the unedited version of the tape, along with the victim's medical records, would have impeached the testimony of Ms. Bland and Ms. Kelley that the victim was wearing a sling and would have called into question the time line of the events. The Petitioner, however, did not submit an unedited version of the tape at the post-conviction hearing. We are unable to determine what, if any, impact the unedited version of the tape would have had on the Petitioner's trial.

### d. Callie Haley

The Petitioner contends that counsel were ineffective in failing to interview or call Callie Haley as a witness at the trial. The Petitioner did not call Ms. Haley as a witness at the post-conviction hearing. This is generally the only means by which a petitioner can establish that counsel should have called the witness at the trial. See Black, 794 S.W.2d at 757. The Petitioner admits in his brief that it is unclear what Ms. Haley would have testified had she been called as a witness.

Ms. Haley gave a statement to the police in which she stated that while she was standing outside her apartment, she saw a person walk from behind the apartments. She was unable to determine the person's gender. She described the person as African-American, 5'4" or 5'5", and dressed in black. The person's face was covered in white. Ms. Haley said the person shot five or six times at a green car and then ran away. She also said that her apartment was on one end of Devon Street and that the shooter was at the other end of the street.

Mr. Nally attempted to interview Ms. Haley, but she did not respond to his requests. Counsel knew Ms. Haley gave a statement to the police and described a white towel covering the shooter's face. Trial counsel and Mr. Nally went to the crime scene and compared her observations to the location of the shooting. Counsel believed Ms. Haley was too far from the shooting to be an effective witness. He was also concerned that she corroborated portions of other witnesses' testimony. Counsel stated that he did not call Ms. Haley as a witness because he determined her testimony would be more harmful to the Petitioner than favorable.

We conclude that counsel made a reasonable, tactical decision against calling Ms. Haley as a witness. The Petitioner is not entitled to relief regarding this issue.

### 3. Failure to Object to Evidence Based on Chain of Custody

The Petitioner contends that counsel failed to object to the admission of bullets based upon a lack of a chain of custody. At the trial, Officer Danny James testified that he collected bullet casing and fragments from the victim's car and documented the evidence. He identified the property envelope and receipt, as well as the bullet fragments and casings. TBI Agent Heath Barker testified about his examination of ballistic evidence and to the procedures for tagging and cataloguing evidence. The Petitioner does not identify any issues of the chain of custody regarding this evidence. The trial court found that counsel had no basis to object to the admission of this evidence, and we agree.

The Petitioner's argument in his brief focuses upon the testimony of Dr. O.C. Smith. Dr. Smith testified that he recovered two bullet fragments from the victim's body. He removed the fragments from a sealed envelope and identified them at the trial. He discussed how he recovered the bullet fragments from the victim's body. This evidence was sufficient to establish that the fragments were the same fragments recovered from the victim's body. Counsel properly declined to object to the admission of this evidence.

The Petitioner also faults counsel for failing to request an independent ballistics investigation. The Petitioner, though, did not present any evidence at the post-conviction hearing to establish what information an independent ballistics investigation would have revealed. This issue is without merit.

The Petitioner argues that counsel's failure to object to Ms. Bland's response of "Uh-huh" to questions created "a chance for misleading or confusing the jury as to her answer." The Petitioner, though, did not cite in his brief any instances when the response likely misled or confused the jury. This issue is without merit.

### 4. Failure to Impeach or Cross-Examine Witnesses Properly

The Petitioner contends that counsel failed to cross-examine Ms. Hunt properly with her pretrial statement and her description of the shooter. He states that Ms. Hunt's description of the shooter's "droopy eyes" did not match his eyes and that Ms. Hunt failed to mention his large scar and gold teeth in her identification.

Ms. Hunt told police officers that she was sitting behind the front passenger seat of the victim's car when she saw a man with a gun and a towel running toward the car. She

identified the man as the Petitioner, who then placed the towel over his face. She said the Petitioner stuck his gun through the front passenger window, which was partially down, and shot the victim in the head.

At the trial, Ms. Hunt testified that when the shooter first ran to the car, a white towel covered his face up to his eyes. She said the shooter's eyes looked like the Petitioner's eyes. She recalled the shooter stood in front of the victim's door and pulled the towel down. Ms. Hunt saw his entire face and identified him as the Petitioner. She stated that the Petitioner said, "Oh, bitch, you want me dead, huh," laughed, and shot the victim.

Although counsel did not mention Ms. Hunt's previous statement to the police during cross-examination, counsel questioned her about her observations and ability to identify the Petitioner as the shooter. Counsel identified the discrepancies between the descriptions of the shooter by Ms. Hunt and Ms. Bland during closing arguments. Also, any failure of counsel to question Ms. Hunt further regarding the events and her recognition of the Petitioner did not result in prejudice. Given that the evidence introduced at the trial established that the Petitioner acted violently toward the victim throughout their relationship and as recently as days before the murder, that he had threatened to kill the victim, and that a car similar to his car was seen driving from the scene after the victim was shot, the Petitioner has failed to show a reasonable probability that additional cross-examination would have affected the results of the trial.

The Petitioner argues that counsel failed to impeach Ms. Bland properly. Ms. Bland testified the shooter's build and height resembled the Petitioner's. She said that the shooter was wearing a black hat, sunglasses, and a towel over his mouth and that she did not see his face. On cross-examination, counsel questioned Ms. Bland regarding her ability to make this identification and her description of the shooter. Counsel argued in closing argument that her testimony was inconsistent. This issue is without merit.

The Petitioner argues that counsel's failure to interview Desi Hall and Tasha Cupp prevented counsel from properly impeaching Officer Alvin Clark. We conclude that counsel were not ineffective in failing to interview Mr. Hall. We do not know what Ms. Cupp's testimony would have been had she testified at the trial because the Petitioner did not present her testimony at the post-conviction hearing.

The Petitioner argues that trial counsel failed to cross-examine Officer Clark regarding discrepancies between his seeing a white car leaving the scene, which resembled the Petitioner's car, and Ms. Kelley's and Mr. Kelley's seeing the car leave the scene. Ms. Kelley testified that after the shooting, she heard tires squealing "like somebody was getting away fast out in the parking lot." Mr. Kelley said he heard gunshots and ran toward the area

where the shots were fired. He ran to the victim's car, removed her from the car, and laid her on the parking lot. He said that while he tended to the victim, he saw a white car resembling the Petitioner's car speed out of the parking lot. Officer Clark testified that he saw a white car speeding away when he arrived at the scene. The Petitioner has failed to establish a reasonable probability that questioning Officer Clark on any discrepancy would have altered the result of the trial proceedings.

### 5. Failure to Object to the State's Closing Argument

The Petitioner contends that counsel were ineffective in failing to object to the prosecutor's improper statements during closing arguments. He argues that the following statements from the prosecutor were improper:

> But Andrea could because she was right behind her, she was right behind Kisha. He took the towel down and saw that much of his face. He looked right at her and I submit, ladies and gentlemen, she would have been dead. She would not be here today just like her cousin Lakisha if he had loaded that nine millimeter with good rounds or if he had a firing pin that worked a little better. I submit one of those bullets that didn't fire that had to be manually ejected was meant for Andrea as she was running for her life as her cousin lay dying.

> You recall Andrea's testimony about it that it was him. For the defense–well, recall what she said, who she said it was and when she said it. Did she wait for three days? Was she telling the truth when she told you who she saw? Of course she was. From the moment it happened she was telling who it was. From the seconds after she had witnesses what was probably the most horrific event in her life she was saying who had done it.

> Mr. Hibler, why didn't you tell it all at the preliminary hearing? Does it get much more honest than that, ladies and gentlemen. When a man sits in front of you 14 strangers in this ominous courtroom with all these people watching and cameras going. I was scared. I didn't want to be there. I didn't want to be there. And everything he tells you is corroborated by everybody else. He came in here and told you what he saw and what he did.

Closing arguments are a "valuable privilege" and should not be unduly restricted. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that

-49-

discretion." Id. We have explained that "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). The generally recognized areas of prosecutorial misconduct in closing arguments occur when the prosecutor misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence of the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those that are matters of common public knowledge. Id. at 6.

The Petitioner argues that the prosecutor improperly bolstered the credibility of Ms. Hunt and Mr. Hibler. A prosecutor is not permitted to endorse a witness' credibility personally. See id. at 7. The prosecutor in this case, however, did not personally endorse the witnesses' credibility but identified evidence supporting the credibility of the testimony of Ms. Hunt and Mr. Hibler, which is permissible in closing arguments.

The Petitioner argues that by stating that one of the bullets that did not fire was meant for Ms. Hunt, the prosecutor improperly argued inferences that were not supported by the evidence. We agree that the argument was improper. Based upon the evidence presented at the trial, however, we conclude that a reasonable probability does not exist that the results of the trial would have been different absent the improper argument.

The Petitioner states in his brief that "throughout this line of argument were improper comments by the prosecution improperly bolstering and vouching for state witnesses that testified either incompletely or differently than other state witnesses." The Petitioner does not identify the additional statements that he maintains were improper. He is not entitled to relief regarding this issue.

### B. Penalty Phase

The Petitioner contends that counsel were ineffective regarding the penalty phase of the trial in (1) failing to have his mental health evaluated and to present additional mitigating evidence; (2) failing to object to the State's improper closing argument; and (3) failing to object to the use of his prior convictions.

Although counsel does not have a constitutional duty to offer mitigation evidence at the penalty phase of a capital trial, counsel does have a duty to investigate and prepare for both the guilt and penalty phases. See Goad v. State, 938 S.W.2d 363, 369-70 (Tenn. 1996).

Counsel does not have an absolute duty to investigate particular facts or a certain line of defense. Strickland, 466 U.S. at 691. As previously noted, though, counsel has a duty to conduct a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Id. In determining whether counsel breached this duty, this court reviews counsel's performance for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as viewed from counsel's prospective at that time. See Wiggins v. State, 539 U.S. 510, 523 (2003). Counsel is not required to investigate every conceivable line of mitigation evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. Id. at 533. Likewise, counsel is not required to interview every conceivable witness. See Hendricks, 70 F.3d at 1040. We will not conclude that counsel's performance was deficient for failing to unveil all mitigation evidence, if, after a reasonable investigation, counsel has not been put on notice of the existence of that evidence. See Babbit v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998).

The United States Supreme Court has held that

> no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe, 528 U.S. at 477 (internal citations and quotations omitted). We review the following factors in determining whether counsel were ineffective in failing to present mitigation evidence: (1) the nature and extent of the mitigation evidence that was available but not presented by trial counsel; (2) whether counsel presented substantially similar mitigation evidence to the jury in either the guilt or penalty phase of the proceedings; and (3) whether the evidence of applicable aggravating factors was so strong that mitigating evidence would not have affected the jury's determination. See Goad, 938 S.W.2d at 371.

### 1. Failure to Have the Petitioner Undergo a Mental Evaluation and to Present Additional Mitigating Evidence

The Petitioner contends that counsel were ineffective in failing to have him evaluated by a mental health professional and present evidence of borderline personality disorder in mitigation. He also contends that counsel were ineffective in failing to prepare mitigation witnesses for their testimony and in failing to present certificates of his completion of various programs while incarcerated for prior convictions.

The trial court found that counsel had no basis upon which to request funding for a mental health evaluation in accordance with Tennessee Supreme Court Rule 13. Due process of law principles require the appointment of expert assistance at the trial when the defendant establishes that such assistance is necessary to conduct a constitutionally adequate defense. See State v. Barnett, 909 S.W.2d 423, 426-28 (Tenn. 1995). The Tennessee Supreme Court has held that "while a State need not provide an indigent defendant with all the assistance his wealthier counterpart might buy . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools of an adequate defense on appeal.'" Id. at 426 (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)).

The obligation of a trial court to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. See Tenn. Sup. Ct. R. 13, § 5(c)(1); Barnett, 909 S.W.2d at 430-31. In the context of criminal trials and appeals, particularized need is established

> when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the request services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2). Particularized need cannot be established and the court should deny funding requests when the motion for such funding includes only:

> (A) undeveloped or conclusory assertions that such services would be beneficial;
> (B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
> (C) information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or
> (D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Id. at (c)(4).

Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. Barnett, 909 S.W.2d at 431. The defendant must refer to the facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to ensure a fair trial. Id. The issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. Id.

In the present case, trial counsel testified that he did not see any evidence from the records or his conversations with the Petitioner indicating mental health issues. Counsel did not recall the specific records that he reviewed but said he would have reviewed the Petitioner's school, medical, and prison records. While the Petitioner's I.Q. score was in the 80s, his school records showed that he was diagnosed with a learning disability, was enrolled in resource classes, failed the fourth and seventh grades, and quit school. The Petitioner's juvenile records included prior assessments, psychological evaluations, and screenings. The Petitioner exhibited multiple episodes of violent behavior resulting in convictions for second degree murder, especially aggravated robbery, and three convictions for aggravated assault. Both the victim and Ms. Crawford complained of the Petitioner's exhibiting violent behavior toward them, and the victim accused him of stalking her. Jail records noted that the Petitioner requested to see a mental health professional in January, February, and March of 2002 while awaiting trial and complained of hearing voices and feeling that "the walls were caving in on him." Counsel either obtained or could have obtained the records that included such information. The Petitioner escaped from jail in May of 2002 and, therefore, was unavailable for an evaluation while on escape status. He was apprehended, however, in July 2002, and the trial was not held until January 2003.

This court notes that the issue in this case is not whether counsel could establish particularized need for an evaluation on issues of competency, an insanity defense, or diminished capacity to present during the guilt phase of the trial. Also, this is not a case in which a defendant was evaluated initially by a mental health expert who did not recommend additional evaluations or testing. See Steven Ray Thacker v. State, No. W2010-01637-CCA-R3-PD, slip op. at 51-52 (Tenn. Crim. App. Mar. 23, 2010), perm. app. denied (Tenn. Aug. 16, 2012). Rather, the issue is whether the facts and circumstances demonstrate particularized need for an initial mental evaluation as it relates to mitigation. We conclude that the facts and circumstances of this case establish such particularized need. Therefore, counsel were deficient in failing to seek an evaluation by a mental health expert.

In examining the issue of prejudice, this court notes that during the penalty phase, counsel presented evidence that the Petitioner had four sisters and four brothers; that his mother was diabetic and underwent dialysis; that his sister, Ruby Ivy, cared for him while their mother was ill; that he was bullied in school and eventually quit school; that his family loved him; that he was respectful to others; that he had a daughter; that determinations of life and death should be made by God; and that life in prison would have been sufficient punishment.

The trial court found that counsel's mitigation strategy was hampered by the Petitioner's refusal to cooperate. Trial counsel said the Petitioner's testimony was the method through which he preferred to introduce evidence of his completion of various

programs while imprisoned for prior convictions. The Petitioner, however, refused to testify during the penalty phase.

The Petitioner also waived his right to present evidence during the penalty phase regarding his background, his father's alcohol abuse, the physical abuse and violence in the household during the Petitioner's childhood, and other events in his life that contributed to his development. He said that if his family members testified, "it should be only that they love me and that they plead with the court to not put me to death. I don't feel that they should get up here getting all into their personal life and have to explain all that to the court." Although the Petitioner now challenges the validity of the waiver, he did not raise the issue in his initial or amended post-conviction relief petitions.

Counsel's presentation of mitigation evidence was also hampered by Ms. Ivy's reference to the Petitioner's good character during her testimony even though counsel had warned her not to do so. By failing to comply with counsel's instructions, Ms. Ivy opened the door to allowing the State to question her about all the Petitioner's prior convictions. Although the Petitioner argues that counsel failed to prepare the mitigation witnesses for their testimony, the trial court credited counsel's testimony and found otherwise.

Counsel also attempted to argue residual doubt to the jury. During opening statements in the penalty phase, trial counsel told the jury that "if you have any residual doubt about his guilt from the first phase, you found him guilty beyond a reasonable doubt, but if you had any residual doubt you can use that as well." The trial court told counsel that his argument was improper and that residual doubt would not be charged to the jury as a mitigating circumstance. On appeal, the Tennessee Supreme Court held that the trial court's ruling was error but that the error was harmless. Ivy, 188 S.W.3d at 156.

In addition to the mitigating evidence presented by counsel, the State presented evidence at the trial of aggravating factors. The State relied upon, and the jury found, two aggravating circumstances to support the death penalty: the defendant was previously convicted of one of more felonies whose statutory elements involved the use of violence to the person; and the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. See T.C.A. § 39-13-204(i)(2), (6) (Supp. 1999).

The State relied upon the Petitioner's prior convictions for second degree murder and especially aggravated robbery and three prior convictions for aggravated assault to support the prior violent felony aggravating circumstance in (i)(2). On appeal, the Tennessee Supreme Court held that the trial court erred in instructing the jury that two of the Petitioner's prior convictions for aggravated assault involved violence to the person but that

-54-

the error was harmless beyond a reasonable doubt. Ivy, 188 S.W.3d at 151-53. The court noted that the trial court properly instructed the jury on the Petitioner's prior convictions for second degree murder and especially aggravated robbery and one of his convictions for aggravated assault, as well as the (i)(6) aggravating circumstance. Id. at 153. The court also noted that the prior convictions upon which the jury properly relied, "particularly second degree murder and especially aggravated robbery, were objectively reliable and qualitatively persuasive." Id.; see State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993) (identifying prior convictions under (i)(2) as often more objectively reliable and persuasive than other evidence).

The Tennessee Supreme Court summarized the evidence supporting the (i)(6) aggravating circumstance as follows:

> [T]he evidence showed that Ivy was on parole when he attacked Thomas near a convenient store on June 6, 2001. He later followed Thomas as she drove to the Criminal Justice Center to swear out a warrant, and he threatened to kill her if she "got the police in his business." Only two days later, Ivy shot Thomas five times at close range.

Ivy, 188 S.W.3d at 149. The court concluded that such evidence was sufficient to support the jury's finding that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution beyond a reasonable doubt. Id.

In light of the evidence presented in both phases of the trial, Dr. Steinberg's diagnosis of borderline personality disorder and the basis upon which he made the diagnosis were of little mitigating value. Dr. Steinberg based his findings, in part, upon the Petitioner's shooting the victim and his confrontations and acts of violence against the victim. The Petitioner, however, denied shooting the victim and committing such violent acts against her and continued to maintain his innocence with Dr. Steinberg and during post-conviction proceedings. Dr. Steinberg's findings that the Petitioner exhibited stalking behavior, had a pattern of unstable and intense interpersonal relationships, experienced impulsivity in potentially self-damaging areas, had an intense range of emotions, and experienced inappropriate intense anger or difficulty controlling anger were not "clearly mitigating" as the jury could have concluded that the Petitioner was "simply beyond rehabilitation." See Cullen v. Pinholster, 131 S.Ct. 1388, 1410 (2011) (holding that evidence of serious substance abuse, mental illness, and criminal history was not "clearly mitigating" because the jury might have concluded that the defendant was beyond rehabilitation); see also Atkins v. Virginia, 536 U.S. 304, 321 (2002) (noting that mitigating evidence can be a "two-edged sword" that juries might find to show future dangerousness).

-55-

Likewise, certificates showing that the Petitioner completed anger management courses while serving a prior sentence would have had little mitigating value in light of the circumstances of the case. The certificates of courses completed before the shooting are evidence that prior efforts to rehabilitate the Petitioner were unsuccessful. Accordingly, based upon the mitigating evidence presented and the strong evidence supporting the aggravating circumstances, the Petitioner has failed to show a reasonable probability that had such evidence been presented, the jury would have concluded that the aggravating and mitigating circumstances did not warrant death.

## 2. Failure to Object to State's Improper Closing Arguments

The Petitioner contends that trial counsel were ineffective in failing to object to the prosecutor's statements during closing arguments in the penalty phase. He argues that the prosecutor improperly invoked emotion and feelings of vengeance. He objects to the following argument:

> [H]e had been convicted of a felony, the statutory elements of which involve violence to the person. Well, what in the world does all that mean. . . ? That's why we put Joe Warren on the stand. And you'll have these back there with you in the jury room and you can look at them. His prior convictions, murder in the second degree, especially aggravated robbery involving a deadly weapon and seriously bodily injury, aggravated assault, aggravated assault, aggravated assault. Five of them, ladies and gentlemen. Four different victims. Four different members of our community. Let me read their names to you. Reginald Parnell, Andrew Ewing, Patsy Pollard and Sharon Branch. Prior victims of the defendant's master plan. . . .
>
> What kind of mitigation proof did Lakisha Thomas get to put on the morning of June 8th, 2001, when she sat defenseless in her own car? What kind of second chance did she get? Wouldn't her four girls love to get a chance to come visit her even if it is behind bars? Wouldn't they have loved that? Do the aggravators outweigh the mitigators? [Counsel] asked you should his life be spared? How many more chances do you get? How many more triggers do you get to pull on the members of this community before the fine people sworn to uphold the law say enough? It won't be easy but the life that he has lived and the choices he made make it simple for you. The punishment shall be death. Thank you.

The prosecutor's argument naming the victims of the Petitioner's prior convictions was related to the prior violent felony aggravating circumstance. The indictments, which included the names of the victims, were both read into evidence and entered as exhibits. The prosecutor was simply referring to evidence that was placed before the jury as part of the argument that the prior violent felony aggravating circumstance should be applied.

The remainder of the prosecutor's argument was related to the State's position that the aggravating circumstances outweighed any mitigating circumstances. The prosecutor did not argue that vengeance or retribution justified the imposition of the death penalty. We cannot conclude that the argument improperly influenced the jury's decision to impose the death penalty.

### 3. Failure to Object to the Use of the Petitioner's Prior Convictions

The Petitioner contends that trial counsel were ineffective in failing to object to the use of his prior convictions to support the prior violent felony aggravating factor. He asserts that that when he entered Alford pleas to the indictments in 1993, the trial court failed to advise him that the convictions could be used to enhance his sentence for subsequent convictions.

Although the Petitioner presents this issue as an ineffective assistance of counsel claim, we conclude that it is a collateral attack upon his prior convictions. Tennessee courts have rejected claims attacking facially valid prior convictions in subsequent proceedings in which the prior convictions were used to enhance punishment. See State v. McClintock, 732 S.W.2d 268, 272 (Tenn. 1987); State v. Prince, 781 S.W.2d 846, 851 (Tenn. 1989); Smith v. State, 757 S.W.2d 683, 685-86 (Tenn. Crim. App. 1988). The Tennessee Supreme Court has held:

> [U]nless invalid on its face, a prior judgment of conviction in a court with personal and subject matter jurisdiction cannot be collaterally attacked in a subsequent proceeding in which the challenged conviction is used to enhance punishment. The authorized route for attacking a facially valid, final judgment of conviction is by the Post Conviction Procedure Act. An evidentiary hearing can be afforded in that forum and not at the proceeding in which such prior conviction is used. Once invalidated, the enhancement value of the conviction is also nullified, exposing the enhanced sentence on the subsequent conviction to collateral attack as well.

McClintock, 732 S.W.2d at 272.

If counsel had objected to the use of the prior convictions on this basis, the objection would have been overruled. Counsel could not have filed a petition for post-conviction relief on behalf of the Petitioner challenging the validity of the pleas as unknowingly and involuntarily entered because the three-year statute of limitations then in effect had expired. See T.C.A. § 40-30-102 (repealed 1995). This issue is without merit.

### III. Ineffective Assistance of Appellate Counsel

The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must present facts that establish (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal; and (2) absent the deficient performance, a reasonable probability existed that the Petitioner's appeal would have been successful before the state's highest court. See e.g., Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparico v. Artuz, 269 F.3d 78, 25 (2d Cir. 2001). In examining whether counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." Id. When an omitted issue is without merit, the Petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. Id. at 887-88.

Counsel is responsible for determining the issues to present on appeal. State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986). This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. Campbell, 904 S.W.2d at 597. The determination of which issues to raise is a tactical or strategic choice. Id.

The Petitioner contends that appellate counsel was ineffective in failing to raise the prosecutor's improper closing arguments in the guilt and penalty phases as an issue of plain error. We have concluded that the prosecutor's argument was not improper or so inflammatory that it likely influenced the jury's determination of the Petitioner's guilt or their decision to impose the death penalty. This issue is without merit.

The Petitioner also contends that appellate counsel was ineffective in failing either to withdraw from the case or to file an application for writ of certiorari in the United States Supreme Court after the Tennessee Supreme Court filed its opinion upholding the Petitioner's conviction and sentence of death. We agree with the trial court's finding that appellate counsel was deficient in this regard. Based upon our supreme court's holding and

reasoning in its opinion on direct appeal, however, we conclude that the United States Supreme Court would have denied any application.

## IV. Issues in the Trial Court

The Petitioner contends that prosecutorial misconduct occurred during closing arguments in the guilt and penalty phases. This issue should have been raised in previous proceedings. Accordingly, this issue is waived. See T.C.A. § 40-30-106(g) (2012).

The Petitioner argues that the application of the prior violent felony aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2) was improper because the trial court failed to tell him at the time that he entered the relevant guilty pleas that the convictions could be used to enhance punishment for future convictions. As we noted, a prior judgment of conviction "cannot be collaterally attacked in a subsequent proceeding in which the challenged conviction is used to enhance punishment." McClintock, 732 S.W.2d at 272. The Petitioner is not entitled to relief regarding this issue.

## V. Constitutional Effectiveness of the Capital Defense Team

The Petitioner contends that the Shelby County Capital Defense Team is "constitutionally ineffective" in both its formation and lack of formal procedures. He cites to multiple provisions of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and argues that violations of these provisions render the capital defense team "constitutionally ineffective." The Petitioner argues that the defense team was not structured to ensure that counsel were free from political influence and were able to provide zealous advocacy in accordance with professional standards in violation of sections 2.1 and 3.1; that the defense team had no procedures in place to properly train attorneys, investigators, and mitigation specialists in violation of sections 4.1, 5.1, and 10.4; that the defense team had no procedures in place to prevent team members from being overworked in violation of sections 6.1 and 10.3; that the team failed to establish a proper working relationship with the Petitioner in violation of section 10.5; and that the defense team failed to investigate the Petitioner's case, present adequate claims and defenses, and attempt to negotiate a plea in violation of sections 10.7, 10.8, 10.9.1, and 10.10.1.

The ABA Guidelines are merely guides in determining what is reasonable and are not the standards for reasonableness. See Strickland, 466 U.S. at 688 (stating that "prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides in determining what is reasonable, but they are only guides"). Failure to comply with the ABA Guidelines does not render counsel ineffective per se. The Petitioner has not established how any failure by counsel to comply strictly with the ABA Guidelines rendered

-59-

them deficient at his trial or resulted in prejudice. We have addressed each claim of ineffectiveness raised by the Petitioner, and we conclude that he received the effective assistance of counsel at the trial and on appeal.

## VI. Constitutionality of the Death Penalty

The Petitioner raises numerous issues contesting the constitutionality of the death penalty. He raised some of the claims in the appeal of his conviction, and this court determined them to be without merit. See State v. David Ivy, No. W2003-00786-CCA-R3-DD, slip op. at 31-32 (Tenn. Crim. App. Dec. 30, 2004), affirmed by State v. Ivy, 188 S.W.3d 132 (Tenn. 2006). The claims that the Petitioner has raised for the first time in these post-conviction proceedings are waived due to his failure to raise them at the trial. See T.C.A. § 40-30-106(g) (2012). Notwithstanding waiver, the Petitioner is not entitled to relief.

The Petitioner contends that Tennessee's death penalty statutes fail to narrow the class of death eligible defendants, specifically, the statutory aggravating circumstances set forth in Tennessee Code Annotated sections 39-2-203(i)(2) and (i)(6) have been so broadly interpreted that they fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. The Petitioner raised this issue on appeal, and we rejected his argument. See David Ivy, slip op. at 31-32.

The Petitioner argues that the death sentence is imposed capriciously and arbitrarily in that:

1. Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. We rejected this argument when the Petitioner raised it on appeal. See id. at 32

2. The death penalty is imposed in a discriminatory manner based upon race, geography, and gender. We rejected this argument when the Petitioner raised it on appeal. See id.

3. Mandatory introduction of victim impact evidence and of other crime evidence upon the prosecutor's request violates separation of powers and injects arbitrariness and capriciousness into capital sentencing. This argument has been rejected. See State v. Odom, 137 S.W.3d 572, 602-03 (Tenn. 2004) (appendix).

4. Defendants are prohibited from addressing jurors' popular misconceptions

about matters relevant to sentencing such as the cost of incarceration versus the cost of execution, deterrence, method of execution, and parole eligibility. This argument has been rejected. See Terry, 46 S.W.3d at 170; State v. Cazes, 875 S.W.2d 253 (Tenn. 1994).

5. The death qualification process skews the makeup of the jury and results in a jury that is more favorable to the prosecution and more likely to find the defendant guilty. This argument had been rejected. See State v. Teel, 793 S.W.2d 236, 246 (Tenn. 1990).

6. The Tennessee Pattern Jury Instructions are inconsistent with the United State's Supreme Court's ruling in McKoy v. North Carolina, 494 U.S. 433 (1990) and Mills v. Maryland, 486 U.S. 367 (1988). This argument has been rejected. See State v. Banks, 271 S.W.3d 90, 159 (Tenn. 2008).

7. There is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances. We rejected this argument when the Petitioner raised it on appeal. See David Ivy, slip op. at 32.

The Petitioner contends that it was a violation of his right to a jury trial under the United States and Tennessee Constitutions and to a reliable result under the Eighth Amendment for the jury to be instructed in accordance with Tennessee Code Annotated section 39-13-204(g) that "if aggravators outweigh mitigators beyond a reasonable doubt, the sentence shall be death." This argument was addressed and rejected in State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990), in which our supreme court stated, "There is no likelihood that this statutory language imposes a "'presumption of death.'" See State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993).

The Petitioner contends that the appellate review process is not meaningful and is inadequate because: (1) the jury is not required to make written findings regarding mitigation circumstances; (2) the informational base for comparative review of first degree murder convictions is inadequate and incomplete; and (3) the courts' methodology for conducting comparative review is flawed. The Tennessee Supreme Court has rejected this claim. See State v. Hester, 324 S.W.3d 1, 78-79 (Tenn. 2010).

The Petitioner contends that Tennessee's lethal injection protocol as a means of effectuating the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, sections

8 and 16 of the Tennessee Constitution. Our supreme court has rejected this contention. See Hester, 324 S.W.3d at 79; State v. Kiser, 284 S.W.3d 227, 275-76 (Tenn. 2009); Abdur' Rahman v. Bredsen, 181 S.W.3d 292, 305-09 (Tenn. 2005); see also West v. Schofield,380 S.W.3d 105 (Tenn. Ct. App. 2012); cf. Baze v. Reese, 553 U.S. 35 (2008) (approving Kentucky's lethal injection protocols, which are identical to Tennessee's protocols).

Finally, the Petitioner contends that the death penalty infringes upon his fundamental right to life. This argument is contrary to settled precedent as reflected in Cauthern v. State, 145 S.W.3d 571, 629 (Tenn. 2004).

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE